# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Petraski v. Thedos*, 2011 IL App (1st) 103218

---

| | |
|---|---|
| Appellate Court Caption | MICHAEL PETRASKI, Guardian of the Estate of Margaret Petraski, a Disabled Person, Plaintiff-Appellee, v. DEBORAH THEDOS, Individually and as Agent/Employee of the Sheriff of Cook County, and MICHAEL SHEAHAN, Sheriff of Cook County, Defendants-Appellants. |
| District & No. | First District, Sixth Division <br> Docket No. 1-10-3218 |
| Filed | December 16, 2011 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a collision at an intersection between plaintiff's vehicle and the vehicle of an officer in the county sheriff's department who was responding to a call with her emergency lights activated, the trial court's grant of a new trial based on defense counsel's improper comments concerning the societal impact of drunk driving was affirmed, and the appellate court also held that the trial court did not abuse its discretion in finding that it erred in admitting testimony of defendants' toxicology expert that plaintiff was intoxicated and impaired and in barring the testimony of plaintiff's expert concerning her psychiatric evaluation of defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-2953; the Hon. Dennis J. Burke, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Anita M. Alvarez, State's Attorney (Michael L. Gallagher, Assistant State's Attorney, of counsel), and Barry G. Bollinger and Gregory V. Ginex, both of Bollinger, Ruberry & Garvey, Special Assistant State's Attorneys, both of Chicago, for appellants.

Michael W. Rathsack and Winters Enright Salzetta & O'Brien (Paul L. Salzetta and Karen McNulty Enright, of counsel), both of Chicago, for appellee.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Garcia and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    On May 28, 2001, Margaret Petraski (Margaret) and Officer Deborah Thedos, of the Cook County Sheriff's Police Department,[1] were involved in a motor vehicle accident at the intersection of the Midlothian Turnpike and Central Avenue in unincorporated Cook County. Officer Thedos admitted that she drove through a red light with her Mars lights activated. She had also activated her siren as she approached the intersection. Margaret was seriously injured in the accident and became a quadriplegic as a result of her injuries. Michael Petraski, Margaret's son and legal guardian, brought a personal injury suit on her behalf against Officer Thedos and the officer's employer Michael Sheahan, sheriff of Cook County.

¶ 2    At the first trial, a jury found for plaintiff. Defendants appealed, claiming that evidence of Margaret's blood-alcohol content (BAC) should have been admitted at trial. This court agreed and reversed the judgment and ordered a new trial. *Petraski v. Thedos*, 382 Ill. App. 3d 22 (2008).

¶ 3    At the second trial, the jury found for the defendants. Plaintiff filed a posttrial motion for a new trial, which was granted by the trial court on October 4, 2010. On November 3, 2010, defendants filed a petition for leave to appeal the interlocutory order pursuant to Illinois Supreme Court Rule 306(a)(1) (eff. Feb. 19, 2010). On January 6, 2011, this court granted defendants' petition for leave to appeal.

¶ 4    On this interlocutory appeal, defendants claim that the trial court abused its discretion by granting a new trial. The trial court found that it had committed three errors, each of which would independently require a new trial. The three errors were: (1) The trial court should

---

[1]The parties' briefs in this case refer to Cook County sheriff's department deputy sheriffs by the title "officer" and we shall also do so here.

-2-

have granted plaintiff's motion to bar defendants' toxicology expert, Dr. Jerrold Leiken, from testifying that Margaret was in fact impaired, solely on the basis of her blood-alcohol level; (2) evidence of Officer Thedos' mental health history was improperly excluded; and (3) defense counsel made improper closing remarks about the societal impact of drunk driving.

¶ 5       For the following reasons, we affirm the trial court's grant of a new trial and remand for further proceedings.

¶ 6                                    I. BACKGROUND

¶ 7       On May 28, 2001, at approximately 2:30 a.m., Margaret and Officer Deborah Thedos, of the Cook County Sheriff's Police Department, were involved in a motor vehicle accident at the intersection of the Midlothian Turnpike and Central Avenue. At the time of the collision, Officer Thedos was responding to a police dispatch about an "unwanted subject, probably ex-wife," in a yard.

¶ 8                                    A. First Trial

¶ 9       The case was first tried before a jury in May of 2006. The jury rendered a verdict in favor of plaintiff and awarded damages in the amount of $35,835,684. The jury reduced this amount by 25% after finding Margaret guilty of contributory negligence. The trial court entered judgment on the verdict against defendants for $26,876,763. The trial court denied defendant's posttrial motion for a new trial, and defendants filed a timely appeal. On direct appeal, this court reversed and remanded for a new trial by finding that the trial court erred when it excluded evidence of Margaret's alcohol consumption. *Petraski*, 382 Ill. App. 3d at 33.

¶ 10                                   B. Second Trial

¶ 11      The case was retried in October 2009. On October 23, 2009, following a three-week trial, the jury returned a verdict in favor of the defendants. The appellate record consists of excerpts from the transcript of the second trial. Since we have only excerpts, this factual background is limited to a discussion of the evidence in the appellate record.

¶ 12                                   1. Pretrial Proceedings

¶ 13      Prior to the second trial, plaintiff filed a motion *in limine* to bar portions of the testimony of defendants' expert, Dr. Leiken, regarding Margaret's BAC. The trial court denied this motion. Plaintiff also filed a motion *in limine* to bar any reference to Officer Thedos being funded by taxpayers, which was granted.

¶ 14      Defendants filed a motion *in limine* to exclude the testimony of plaintiff's expert, Dr. Helen Morrison, regarding her psychiatric evaluation of Officer Thedos. This motion was also granted.

¶ 15      In plaintiff's offer of proof, plaintiff stated that Dr. Morrison had made a psychiatric evaluation following an examination of Officer Thedos' medical and personnel records and

the depositions of Thedos' psychiatric treating physicians. Plaintiff stated that, had she testified, Dr. Morrison would have opined that Thedos suffered from bipolar disorder and possible attention deficit disorder. In Dr. Morrison's opinion, Thedos overacted to a nonemergency situation due to factors including stress related to her own domestic situation, and that Thedos' behavior was an oversensitive reaction to stimulus.

¶ 16        Dr. Morrison would have also testified that Officer Thedos' failure to take her medication as prescribed contributed to her psychiatric symptoms and that her condition was not under control at the time of the accident. Dr. Morrison would have further opined that Officer Thedos' bipolar disorder manifested in symptoms of anger, irritability, poor judgment, and impulsivity, and that these symptoms led to Thedos' oversensitive reaction to what she perceived as an emergency call. Dr. Morrison would have testified that Officer Thedos' psychiatric condition was a primary cause of the accident.

¶ 17                                   2. Evidence at Second Trial

¶ 18        Plaintiff's evidence consisted of the testimony of: Officer Yolanda Collins, who was accompanying Officer Thedos at the time of the dispatch; Officer Thedos, who was called as an adverse witness; criminology expert Geoffrey Alpert; sheriff's department investigator Officer Craig Wilk; sheriff's department officer Donna Mallon; accident reconstruction expert Arnold Siegel; Cook County traffic engineer Richard Jezierny; and Margaret Petraski's children, Laura and Michael Petraski.

¶ 19        Defendants called accident reconstruction expert Robert Seyfried; Margaret Vahl, who was a short distance from the intersection at the time of the accident and heard the collision; Ann Lovegrove, a nurse who testified as an expert on long-term care for catastrophically injured individuals; police procedures expert Tom Walton[2]; and toxicology expert Dr. Jerrold Leiken.

¶ 20                                   a. Officer Yolanda Collins

¶ 21        Cook County Sheriff's Police Department Officer Yolanda Collins testified on behalf of plaintiff. Officer Collins testified that on May 28, 2001, at around 2 a.m., Thedos and Collins had parked their vehicles together in the driveway of a White Hen convenience store, located within Collins' beat at 143rd Street and 82nd Avenue. She and Officer Thedos were assigned to adjacent beats. The officers were engaged in traffic enforcement duties. Officer Collins testified that she recalled the radio dispatch of an "unwanted subject banging on the door, possibly an ex-wife." She testified that an "unwanted subject" call was different from a domestic disturbance, but also testified that such a call could become a domestic disturbance. There was no mention in the dispatch of a life-threatening situation or immediate harm.

¶ 22        Officer Collins testified that she heard the officer assigned to the beat that contained the address respond to the dispatch and that Thedos also responded that she was en route as

---

[2]The excerpt of the trial testimony of defense expert Tom Walton's in the appellate record provides only Walton's testimony as to his qualifications as an expert.

back-up. Officer Collins testified that Thedos chose to respond to the call because it was located in the beat adjacent to hers. However, because Thedos was in Collins' beat at the time of the call, Thedos would have to drive from her location in Collins' beat, through her own beat, to reach the location of the dispatch which was in even another further beat.

¶ 23    Officer Collins testified that she followed Officer Thedos to the boundary of Collins' beat and then turned north. She testified that, when Thedos pulled out of the driveway in response to the call, Thedos activated her lights and siren.

¶ 24    Collins testified that, after she turned north, she heard Officer Thedos state over the radio that she had been involved in a "10/50," which is the code for a traffic accident. Collins then proceeded en route to the scene of the traffic accident. Collins testified that, when she arrived at the scene, she checked on Thedos and the driver of the other vehicle, who was unconscious and slumped over the steering wheel. She then returned to Officer Thedos and secured various items from the vehicle including a shotgun, other equipment in the trunk of Thedos' vehicle, and Thedos' personal items. She testified that at some point she also secured Thedos' personal weapon.

¶ 25    Officer Collins testified that she was familiar with the intersection where the accident occurred and agreed that the traffic signal system at the intersection included a left-turn arrow signal for westbound traffic turning south from Midlothian Turnpike into Central Avenue.

¶ 26    Officer Collins testified that she did not hear Thedos announce "code" when she was responding to the subject call. A "code" response means that the officer was responding to the dispatch as an emergency. She further testified that, regardless of whether or not an officer is proceeding by "code," the officer's orders are to avoid collisions and exercise caution to avoid accidents. On cross-examination, Collins testified that it was common practice for another officer to back up the responding officer without first being requested to do so by the dispatcher.

¶ 27                    b. Officer Deborah Thedos, Defendant

¶ 28    Officer Thedos was called as an adverse witness in plaintiff's case. Thedos testified that she had been employed with the Cook County sheriff's department for approximately 15 years at the time of the accident. She had been employed with the sheriff's police department for 10 of those years. She had worked on various assignments during her time with the sheriff's police department and had been assigned a patrol responsibility in the Markham District for approximately six or seven months at the time of the accident. She had worked on several different beats and was assigned to beat 47 on the night of the accident. She was familiar with the officers in the adjacent beats and was knowledgeable about the boundaries and geography of each beat.

¶ 29    Officer Thedos testified that she heard Officer Craig Januchowski, the officer assigned to beat 45, receive the radio call to respond to the report of the "unwanted subject." Officer Thedos testified that she announced she would be en route to the call and told the dispatcher she could cover if needed. Thedos testified that Officer Healy was assigned to beat 43. Within the same minute of announcing that she was en route, she heard Officer Healy

announce that he was also responding to the call. Thedos testified that announcing her location and announcing "code" are both required by the sheriff's department general orders, but that she failed to do either.

¶ 30 Officer Thedos testified that she was familiar with the rules that officers are mandated to follow in their operation of vehicles. She testified that she was aware of an obligation to strictly obey all traffic laws. Thedos testified that in an emergency rapid response situation it is always considered paramount to operate vehicles at a speed or in a manner that does not interfere with complete control at all times. She testified that she was not to proceed through intersections until all other traffic had yielded the right-of-way. Officer Thedos agreed that she understood that having other vehicles yield the right-of-way was a privilege, and that she was not to proceed through an intersection until yielding had occurred.

¶ 31 Thedos testified that, regardless of the type of emergency, she was to operate her vehicle in a manner to permit other motorists an opportunity to move out of the way. She was required to adhere to basic rules of traffic safety regardless of assignment, and there were no exceptions to this rule. Thedos further testified that in an emergency situation she was permitted to proceed with the use of a siren and warning lights, but that she was obliged to notify the radio dispatcher if she were proceeding in that manner. Thedos agreed that the reason for this obligation was so a field supervisor would be aware of how officers were operating their vehicles. She testified that regardless of assignment she was required to inform the dispatcher of an intention to proceed with emergency equipment.

¶ 32 Thedos testified that, while an officer is using lights and siren, traffic conditions may dictate the officer slow down to safely proceed through an intersection. She testified that she was unaware that the law provided that motorists be given the opportunity to clear an intersection when an emergency vehicle is approaching.

¶ 33 Thedos testified that the "unwanted subject" dispatch was issued at 2:20 a.m. She further testified that, based on her experience and general orders, a domestic disturbance is considered an emergency. Thedos also acknowledged that there was a difference between "unwanted subject" calls and domestic disturbance calls. At 2:22 a.m. Officer Januchowski received the call, and in the same minute, Officers Thedos and Healy both announced they were responding to the call.

¶ 34 From the driveway of the convenience store, Thedos proceeded east on 143rd Street. Thedos testified that, while en route, she had stopped at the intersection of 143rd Street and Harlem Avenue. She had come to a stop, despite her siren and lights, due to the traffic conditions. She testified that her siren was not in continuous operation but that she activated it as she approached intersections. Thedos also admitted that she stopped at Ridgeline Avenue, the next major intersection after Harlem Avenue. After passing Ridgeline Avenue, 143rd Street entered an area consisting of the forest preserve and then jogged to the northeast, becoming Midlothian Turnpike. Thedos proceeded on the Turnpike to Central Avenue, where the collision occurred.

¶ 35 The intersection of Midlothian Turnpike and Central Avenue consisted of left and right through lanes for eastbound traffic on Midlothian Turnpike, and left and right through lanes for westbound traffic, with the addition of a left-turn lane for westbound traffic turning south

onto Central Avenue.

¶ 36    Thedos testified that the light for eastbound traffic on Midlothian Turnpike was red the entire time as she approached the intersection. As she approached she observed a vehicle stopped at the red light at the intersection. The vehicle was stopped in the eastbound left through lane of Midlothian Turnpike. She was aware that approaching a red light heading eastbound on Central Avenue could mean there was a green light for traffic coming from the south on Central Avenue, or that there was a green left turn arrow for westbound traffic on Midlothian Turnpike.

¶ 37    Thedos testified that there were limited sight lines for cross-traffic at the intersection. She noticed the vehicle stopped at the red light in the left through lane of eastbound Midlothian Turnpike when she was approximately a block from the intersection. Thedos changed from the left-hand lane to the right-hand lane to proceed around the vehicle and to "get a better view of the intersection." She identified the vehicle as a large tan or gold four-door sedan.

¶ 38    Thedos testified that, as she maneuvered from the left to the right through lane of eastbound Midlothian Turnpike, she saw Margaret's vehicle stopped in the left-turn lane for westbound traffic on Midlothian Turnpike. The vehicle stopped in the left through lane of eastbound Midlothian Turnpike and Margaret's vehicle in the left-turn lane of Westbound Midlothian Turnpike were the only two vehicles Officer Thedos observed at the intersection.

¶ 39    Thedos admitted that she was expected to know the speed her vehicle was traveling at all times, but she testified that she did not know the speed she was traveling on her way to the call because she was "watching the road." She testified that, when she was 20 feet from the intersection, Margaret's vehicle was still stopped. Thedos did not observe Margaret's vehicle turning until Thedos was five feet into the intersection. Thedos testified that when she reached the intersection at Central Avenue she went through a red light. She testified that she braked before the intersection, and then as she entered the intersection, she accelerated.

¶ 40    At 2:26 a.m., Thedos reported the accident that she was involved in. She admitted that the four minutes between 2:22 a.m. and 2:26 a.m. included some time where she had regained her senses following the collision. She was not sure if she had lost consciousness, but she did not remember the collision. After she regained her senses, she first tried to report the collision using her vehicle's radio. When that radio failed to work, she called in the report on her shoulder radio. Thedos was located approximately 8½ miles from the location of the subject call at the time she responded en route. She testified that she had traveled approximately three miles at the time of the accident.

¶ 41    Thedos testified that the collision occurred in a portion of the right through lane of eastbound Midlothian Turnpike. She was unsure of her speed but acknowledged that she was traveling above the speed limit. The speed limit on Midlothian was 45 miles per hour and changed to 40 miles per hour east of Central. She testified that, as she approached the intersection, she was looking toward the north side of the intersection and that she observed a green light for northbound Central Avenue. She also testified that she observed "a green glow" coming from the southern side of the intersection. Thedos testified that she submitted a report to Officer Mallon approximately a week after the crash. She testified that she did not remember telling Officer Mallon that she had assumed that both north and southbound sides

-7-

of Central Avenue had green lights, but upon reviewing a copy of the report, Thedos acknowledged that she must have made that statement.

¶ 42 Thedos testified that she was unaware that there could never be a green light for both north and southbound traffic on Central Avenue at the same time. She testified that, as she approached the intersection, she had assumed that because there was a green light for travel on Central Avenue, then Margaret's vehicle must have a red light. Thedos did not observe any vehicles travelling north or southbound on Central Avenue. Thedos testified that she did not observe Margaret's vehicle start to turn. After the impact she initially believed the collision had involved a vehicle coming from the north side of Central Avenue.

¶ 43 In closing argument, defense counsel stated that Thedos had wrongly believed that both lights on Central Avenue were green and that Thedos was wrong when she said that Margaret began her turn when Thedos was just 20 feet from the intersection.

¶ 44 c. Geoffrey Alpert, Plaintiff's Retained Criminology Expert

¶ 45 Plaintiff's retained criminology expert, Geoffrey Alpert, testified that police officers are trained to understand that civilian responses to an approaching emergency vehicle are unpredictable and that they should not make assumptions about how a motorist will react. Alpert testified that this unpredictability is especially significant at intersections and that the sheriff's department general orders requiring an officer not to proceed through an intersection until all other traffic has yielded the right-of-way means that officers should slow down to a speed where the officer can respond to a motorist's unpredictable reactions.

¶ 46 Alpert testified that, regardless of the nature of the call an officer is responding to, safe driving is of paramount importance. Alpert opined that there would be almost no circumstance where driving through a red light at an intersection would be allowable and that Officer Thedos' response was inappropriate and violative of the public trust. In his opinion, Officer Thedos did not slow down sufficiently to control the intersection, and her conduct was reckless.

¶ 47 On cross-examination, Alpert opined that "unwanted subject" calls are a subset of domestic disturbance calls and that domestic disturbance calls involving alcohol are particularly dangerous situations for police officers. However, he noted that there was no mention of alcohol in the dispatch here.

¶ 48 d. Officer Craig Wilk, Sheriff's Police Accident Investigator

¶ 49 Cook County Sheriff's Police Department Officer Craig Wilk testified that he was responsible for conducting an investigation of the accident on behalf of the sheriff's police department. Officer Wilk testified to his qualifications as a reconstruction expert.

¶ 50 Officer Wilk then described his reconstruction methods and explained the calculations used to reach his estimates of the vehicles' respective speeds. He started with the resting place of the vehicles and worked in reverse to the point of the impact of the collision. His calculations took into account the weights of the vehicles and the coefficient of friction of the surfaces on which the vehicles traveled. He used the marks, scrapes, and gouges left on

the roadway, the fluid splatter, and the damage to the vehicles to come to a conclusion as to the vehicles' respective postimpact speeds. Based on the coefficient of friction of the surfaces and how the vehicles moved across the surface, Wilk determined a drag factor of the vehicles. Using this drag factor, the direction of travel and weights of the vehicles, Officer Wilk was able to use a formula to calculate preimpact speeds.

¶ 51　　Officer Wilk testified that the evidence was consistent with Margaret's vehicle making a left turn at the time of the collision. Officer Thedos' vehicle struck the side of Margaret's vehicle. The force of the collision spun Margaret's vehicle 270 degrees. Officer Thedos' vehicle spun 180 degrees, jumped an 8- or 9-inch concrete curb, and slid backwards on a grassy area at the side of the roadway before coming to rest.

¶ 52　　Officer Wilk testified that in his initial report he had calculated the speed of Officer Thedos' vehicle to be 67 miles per hour at the time of the impact, but due to a transposed number in his initial calculations that number was later revised to 68.9. Wilk testified that he had initially calculated the speed of Margaret's vehicle at 21 miles per hour, but as a result of his revised calculations that number would decrease to approximately 19 miles per hour.

¶ 53　　Officer Wilk believed that his observations at the accident scene supported the drag factor calculations he had used, and he testified that he had chosen a drag factor at the conservative end of the allowable range. He opined that, whether a vehicle's wheels are locked or whether the vehicle is spinning, the drag factor is similar.

¶ 54　　Officer Wilk also testified to the light sequence at the intersection. He testified that the lights for Midlothian Turnpike would only be red if traffic on Central Avenue had activated a sensor, and that the lights for north and southbound traffic on Central Avenue could not be green at the same time. Wilk further testified that a vehicle stopped in the left through lane of Midlothian Turnpike facing eastbound could have potentially obscured Margaret's vision.

¶ 55　　On cross-examination, Officer Wilk testified that the drag factor used in his calculations would have been lower if the vehicles' wheels were free rolling. He would still expect the driver of a vehicle in the westbound left-turn lane on Midlothian Turnpike to observe an approaching police vehicle, or at least the flashes from the emergency lights. Wilk also testified that, when westbound traffic on Midlothian Turnpike has a green left-turn arrow, it is possible for northbound traffic on Central Avenue to have a green right-turn arrow.

¶ 56　　　　　　　　　　　e. Detective Donna Mallon

¶ 57　　Cook County Sheriff's Police Department Detective Donna Mallon testified that she was asked to perform an investigation of the accident. She testified that she interviewed Officer Thedos approximately five days after the accident and that Thedos had an attorney present during the interview. Mallon testified that Thedos had told her that she had activated her lights and siren prior to the collision. Thedos told Mallon that she slowed and stopped at every intersection. Thedos told Mallon she observed green lights for north and southbound traffic on Central Avenue. She looked both ways at the intersection, but hit a grey vehicle and did not know where it came from. Mallon testified that Thedos told her that the vehicle "wasn't in the intersection when she arrived until the last minute." Mallon testified that, when asked, Thedos could not recall her speed at the time of the accident.

¶ 58                    f. Richard Jezierny, Traffic Engineer

¶ 59    Richard Jezierny testified on behalf of the plaintiff. He was employed as a traffic engineer with the Cook County department of highways, and he testified that he had been involved in the preparation of a report prepared at plaintiff's request detailing the functioning of the light system at the intersection of Central and Midlothian and that he was familiar with the intersection and the lights systems.

¶ 60    Jezierny testified that the lights on Midlothian Turnpike remained green unless a vehicle detector sensed a vehicle approaching from the north or south on Central Avenue. This detector triggered a cycle that turned the lights green for that direction on Central Avenue. When either north or southbound Central Avenue traffic had a green light, all other lights would be red. If a vehicle entered the left-turn lane on westbound Midlothian Turnpike while Central Avenue had a green light, this would trigger the left-turn lane signal to activate. While westbound Midlothian Turnpike had the protected left-turn signal, northbound Central Avenue would also have a green right-turn arrow for traffic turning onto eastbound Midlothian Turnpike.

¶ 61    On cross-examination, Jezierny testified that there was a limited time interval where a vehicle could arrive in the left-turn lane on Midlothian Turnpike to trigger the protected turn, and if a vehicle arrived outside that interval the left-turn arrow would not illuminate at the conclusion of the cycle. Jezierny further testified that, if northbound traffic had a green light, it was impossible for the left-turn arrow on westbound Midlothian Turnpike to also be activated.


¶ 62              g. Arnold Siegel, Plaintiff's Accident Reconstruction Expert

¶ 63    Plaintiff's accident reconstruction expert, Arnold Siegel, opined that Officer Wilk's speed calculations were overly conservative and that, in his opinion, Officer Thedos' vehicle was traveling between 70 and 75 miles per hour at the time of the collision. Siegel testified that 70 miles per hour translates to approximately 103 feet per second. Siegel testified that, had Thedos attempted to slow down before the intersection and then reapplied the accelerator within 20 feet from the intersection, the vehicle would not have time to appreciably accelerate. Siegel further testified that a vehicle traveling at 50 miles per hour could not accelerate to 70 miles per hour within 20 feet.

¶ 64    Siegel testified that his calculation for Margaret's vehicle at the time of the impact was 14-17 miles per hour. He testified that he had timed vehicles in the intersection traveling from the stop line of the left-turn lane to the area of impact. The distance traveled was approximately 85 feet, and most vehicles traveled that distance in five to seven seconds. Based on the point of impact, Siegel opined that the turn was a "normal average turn *** just like all of the exemplar vehicles." He noted that the front wheels of Margaret's vehicle had already entered the Central Avenue portion of the intersection when the impact occurred, and within less than a second, her entire vehicle would have been on Central Avenue.

¶ 65    Siegel testified that, based on his calculations, Officer Thedos' vehicle would have been over 500 feet east of the intersection at the time Margaret began her turn, and from that distance at night it would be difficult to discern the speed of an approaching vehicle.

¶ 66                                   h. Laura Petraski

¶ 67    Laura Petraski, Margaret's daughter, testified to her mother's enjoyment of gardening, crafts, and baking prior to the accident. She testified that her mother was in a coma for approximately a month following the accident, and she described her mother's ongoing care.

¶ 68                                   i. Michael Petraski

¶ 69    Michael Petraski, Margaret's son and legal guardian, testified to his mother's difficulty in communicating as a result of her injuries sustained in the accident. Michael testified that his mother could slightly move one hand, and was able to communicate by pointing to letters on a board. She was unable to speak, and had to be moved every two hours to prevent bedsores. She was fed through a tube and was unable to close one eye. He testified that, following the accident, his mother had become depressed, anxious, and frustrated at her condition. Michael testified, and both parties stipulated, that his mother's medical expenses totaled $1,218,352. Following Michael Petraski's testimony, the plaintiff rested.

¶ 70          j. Robert Seyfried, Defendants' Retained Accident Reconstruction Expert

¶ 71    Defendants' retained accident reconstruction expert Robert Seyfried testified that he disagreed with the drag factor calculations used in Officer Wilk's reconstruction of the accident. Seyfried admitted that Wilk's drag factor calculations were conservative. However, Seyfried opined that each vehicle had only one wheel locked as a result of collision damage and that the other wheels would have been free rolling after the impact. In his opinion this warranted a lower drag factor than that used by Officer Wilk.

¶ 72    Seyfried opined that Margaret's vehicle was traveling at 14 to 16 miles per hour at the time of the collision, and Officer Thedos' vehicle was traveling at 49 to 56 miles per hour. On cross-examination, Seyfried testified that he had originally calculated that Petraski's vehicle was traveling at 16 to 17 miles per hour and that Thedos' vehicle was traveling at 60 to 66 miles per hour, but that he had later revised his calculations.

¶ 73    Seyfried testified that he had timed the sequence of the traffic signals at the intersection of Midlothian Turnpike and Central Avenue using a stopwatch. Seyfried testified that the lights for northbound and southbound traffic on Central Avenue could not be green at the same time. If there was a green light for traffic traveling northbound on Central Avenue, the lights for Midlothian Turnpike would be red. If the sensor at the intersection did not detect a vehicle on Central Avenue for 5 to 5.5 seconds, it would cycle the light to yellow for approximately 4.3 seconds, and then 1.8 seconds where all the signals would be red. Seyfried testified that if there were no traffic on Central Avenue and a red light for eastbound Midlothian Turnpike for longer than 11.5 seconds, it would be because a vehicle in the westbound left-turn lane on Midlothian Turnpike had activated a green left-turn signal.

¶ 74    Seyfried testified that, if Margaret's vehicle was stopped near the stop line in the left-turn lane when Officer Thedos' vehicle was 20 feet from the intersection, it would have been impossible for the collision to occur.

## k. Margaret Vahl, Event Witness

¶ 76    Margaret Vahl testified that she was in the driveway of a friend's house, located approximately two blocks east of the intersection of Midlothian Turnpike and Central Avenue, at the time of the accident. She testified that she heard the "whoop-whoop" sound of a siren for two to three seconds, followed by a "boom."

¶ 77    Vahl testified that she immediately began running toward the sound and arrived at the scene of the accident before any other emergency vehicles arrived. She testified that she observed Officer Thedos exit her vehicle and fall to the ground. The emergency lights on the vehicle were activated when she arrived at the scene. She approached Thedos to "see if she was okay and if anybody called 911 and got everybody help." Vahl testified that Thedos told her to "go help the other people, to make sure that they're okay." She characterized Thedos' emotional state as "very upset." She attempted to calm Thedos down and stayed with her until another police officer arrived. Vahl never approached the individual in the other vehicle.

## l. Ann Lovegrove, Defendants' Retained Damages Expert

¶ 79    Ann Lovegrove testified that she had made a life care plan for Margaret at defendants' request. The plan was offered into evidence and published to the jury without objection. The plan detailed Lovegrove's opinions as to Margaret's present and future medical care needs given her quadriplegia following the accident. Lovegrove's report included a range of costs for Margaret's lifetime care, ranging from $3,924,289 to $4,091,560.

## m. Dr. Jerrold Lieken, Defendants' Retained Toxicology Expert

¶ 81    Dr. Jerrold Lieken testified that Margaret's medical records showed that her blood was drawn at 4:08 a.m. and tested for alcohol content. The blood test showed a blood-serum level of 0.116. Lieken testified that whole blood is less concentrated than serum and that the standard rate of conversion between serum and whole blood is between 12% and 20%. Given this range of conversion, Margaret's whole blood alcohol concentration would be between 0.103 and 0.097. Lieken testified that a conversion rate as high as 25% is occasionally used, and that rate would mean a whole blood-alcohol level of 0.093.

¶ 82    Lieken testified that, once alcohol is consumed, it is absorbed into the bloodstream within minutes, and the metabolic process that begins to eliminate alcohol from the bloodstream could also begin within minutes. Lieken opined that the majority of the population would have fully absorbed any alcohol between 30 to 60 minutes after consuming the alcohol. Margaret's blood draw occurred approximately 90 minutes after the accident, and she could not have consumed any alcohol in that time. Lieken testified that alcohol is metabolized in the liver over time and opined that, based on the time that had passed between the accident and the blood draw, Margaret's BAC was higher at the time of the accident than at the time her blood was drawn.

¶ 83    Lieken testified that, in his experience, once an individual arrives at the emergency room, he or she is almost always in a metabolic phase. He testified that severe trauma slows down

the absorption process and that individuals who sustain trauma will often vomit the contents of their stomach, preventing any further absorption. Based on Margaret's medical records, Lieken opined that Margaret would have been in a postabsorption stage after the accident. Lieken testified that retrograde analysis would place Margaret's serum-blood alcohol level at between 0.131 and 0.161 at the time of the accident, indicating a whole-blood alcohol range between 0.109 and 0.144.

¶ 84        Lieken testified to the effects of alcohol in the average person. He testified that alcohol can cause perceptual abnormalities including reduced depth perception, impaired judgment, lack of coordination, and increased reaction time. He opined that even someone with a lower BAC than Margaret would also suffer from these abnormalities to a lesser degree. Lieken then proceeded to testify as follows:

> "DEFENSE COUNSEL: Doctor, based on your experience and background to a reasonable degree of medical and toxicology certainty, do you have an opinion whether or not at the time of this occurrence Margaret Petraski was intoxicated?
>
> DR. LIEKEN: Yes, I do.
>
> DEFENSE COUNSEL: And what is your opinion?
>
> DR. LIEKEN: Margaret Petraski was intoxicated at the time of the accident.
>
> DEFENSE COUNSEL: And, Doctor, based on your experience and background to a reasonable degree of medical and toxicology certainty, do you have an opinion whether or not at the time of this occurrence Margaret Petraski was impaired?
>
> DR. LIEKEN: Yes, I do.
>
> DEFENSE COUNSEL: And what is your opinion?
>
> DR. LIEKEN: That she was impaired at the time of the accident.
>
> ***
>
> DEFENSE COUNSEL: Doctor, as you sit here today and based upon your background in medicine and toxicology, do you have an opinion as to whether the things you mention that would affect somebody at the level of blood alcohol that Margaret Petraski had, whether that did, in fact, affect Margaret Petraski on the night of this occurrence?
>
> DR. LIEKEN: Yes.
>
> DEFENSE COUNSEL: And at the time of the occurrence?
>
> DR. LIEKEN: Yes.
>
> DEFENSE COUNSEL: And what is your opinion?
>
> DR. LIEKEN: That it did affect her on the night and time of the occurrence."

¶ 85        On cross-examination, Dr. Lieken admitted that massive trauma could cause lower rates of alcohol elimination. He acknowledged that a variety of factors including gastrointestinal pathology and body mass index could play a role in alcohol absorption, and that food consumption could also play a minor role. Dr. Lieken testified that he used a range of percentages in his calculations to account for these differing factors, but offered no testimony as to how these factors affected Margaret specifically. Dr. Lieken admitted that he could not

quantify Margaret's level of impairment. He opined that coordination is not significantly diminished at BAC levels below 0.1, but that he would consider a person impaired at BAC levels as low as 0.02. Dr. Lieken acknowledged that he was not aware of any specific facts regarding Margaret's actions on the night of the accident. He did not testify as to how food consumption, weight or gender would affect Margaret's level of impairment.

¶ 86                                    3. Closing Arguments

¶ 87      Defense counsel's closing argument included the following statements, which are at issue on this appeal:

> "There really are not just two people in the case. There are three that have to be considered. There is Margaret Petraski. There is Deborah Thedos. And there is all the rest of us. And we have to consider what we want out there.
>
>                                         * * *
>
> We *** make judgments about who should be on our roads and the condition they should be in. And we do that because we know that there are certain people who should not be on the road when they are impaired. We, as a society, accept that and know it to be true.
>
>                                         * * *
>
> Deborah Thedos *** embodies what we want to help us in our community. *** Mrs. Petraski embodies exactly what we do not want on our roads."

¶ 88      Defense counsel also stated that Officer Thedos was "doing her job as a police officer that we, as residents of Cook County, pay her to do." Finally, defense counsel closed with the following: "Let me share one of my images, when the aunt who helped raise me died from a drunk driver. *** That's an image I have. What do we want on our roads?" Plaintiff's objection to this statement was overruled, and defense counsel continued: "Ladies and gentlemen, there was one person, one person that night who had the right to be on that road. That was this police officer."

¶ 89                                4. Verdict and Posttrial Motion

¶ 90      On October 23, 2009, at the close of the second trial, the jury returned a verdict for defendants. On December 21, 2009, plaintiff filed a posttrial motion for a new trial. Following a hearing on May 20, 2010, the trial court granted plaintiff's motion on October 4, 2010, on the grounds that it had erred in: (1) allowing expert testimony regarding blood-alcohol content; (2) barring expert testimony regarding defendant Officer Thedos' mental health; and (3) in not striking inappropriate statements made by defense counsel in closing argument.

¶ 91      On November 3, 2010, defendants filed a petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(1). On January 6, 2011, this court granted the petition for leave to appeal. On appeal, plaintiff claims that the trial court abused its discretion when it granted a new trial.

¶ 92                                    II. ANALYSIS

¶ 93        On appeal, defendants claim that the trial court abused its discretion when it granted a new trial. The trial court granted a new trial finding: (1) that defendants' expert, Dr. Leiken, should have been barred from testifying as to plaintiff's possible impairment as a result of her blood-alcohol level; (2) that evidence of Officer Thedos' mental health was improperly excluded; and (3) that comments made by defense counsel during closing arguments were improper.

¶ 94        For the following reasons, we find that the trial court acted within its discretion, and we affirm. Specifically, we find that the trial court did not abuse its discretion when it granted a new trial on the basis of defense counsel's improper closing arguments. Since we remand for further proceedings, we will also address the issues of the admissibility of the testimony of defendants' expert, Dr. Lieken, and plaintiff's expert, Dr. Morrison, which the parties have raised and briefed on this appeal.

¶ 95                            A. Improper Closing Argument

¶ 96        On appeal, defendants claim that the trial court abused its discretion when it found that comments made by defense counsel during closing arguments were improper and warranted a new trial. Defendants note that several of the challenged comments were made without objection and claim that the comments were invited by plaintiff's counsel during plaintiff's closing arguments.

¶ 97        The prejudicial impact of remarks made in opening statements or closing arguments is a matter left to the sound discretion of the trial court, and the trial court's ruling will not be overturned on review absent an abuse of discretion. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 649 (2010) (citing *Morgan v. Richardson*, 343 Ill. App. 3d 733, 740 (2003)). Greater deference is granted to a trial court's grant of a new trial than to a denial. *Thomas v. Chicago Transit Authority*, 16 Ill. App. 2d 470, 476 (1958) (citing *Bergman v. Gilbert*, 6 Ill. App. 2d 206 (1955)). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)). "In passing upon the question as to whether or not the trial court *** was justified in granting a new trial, we must bear in mind that there are many things which a trial judge observes on a trial that do not appear from the printed record ***." (Internal quotation marks omitted.) *Spankroy v. Alesky*, 45 Ill. App. 3d 432, 437 (1977) (quoting *Gavin v. Keter*, 278 Ill. App. 308, 315 (1934)).

¶ 98        In granting plaintiff's motion, the trial court noted that attorneys are permitted a wide latitude in closing argument. *Guzeldere v. Wallin*, 229 Ill. App. 3d 1, 13 (1992). The trial court still found that defense counsel's closing argument was improper in several respects and that cumulatively these comments warranted a new trial.

¶ 99        First, the trial court found that defense counsel improperly charged the jury with rendering a moral or social judgment in verdict form. The trial court, citing *Zoerner v. Iwan*, 250 Ill. App. 3d 576 (1993), reasoned that Illinois courts have explicitly refused to allow moral or social arguments in the context of cases involving drunk driving.

¶ 100    Second, the trial court noted that it was improper for defense counsel to stress Officer Thedos' job as a public servant with a taxpayer-funded salary. The trial court noted that, in *French v. City of Springfield*, 5 Ill. App. 3d 368 (1972), a comment that the jurors, as taxpayers, should identify themselves with the defendant city was "not only patently prejudicial but of such impropriety that it, standing alone, would have required [a] reversal." *French*, 5 Ill. App. 3d at 379. In the case at bar, the trial court noted that while plaintiff did not object to the statement during trial, the statement was in direct violation of the trial court's order that granted plaintiff's motion *in limine* barring any reference that Officer Thedos' salary was funded by taxpayers.

¶ 101    Finally, the trial court found that defense counsel's personal story emphasizing the social danger of drunk driving was improper. The trial court, citing *Hansel v. Chicago Transit Authority*, 132 Ill. App. 2d 402 (1971), noted that counsel should not indulge in assertions that have no bearing or relation to the case whatsoever. *Hansel*, 132 Ill. App. 2d at 407.

¶ 102    Defendants claim that defense counsel's comments were proper, as they were made in response to plaintiff counsel's closing arguments. They further claim that defense counsel made no explicit reference to "taxpayers" in closing and, therefore, did not violate the trial court's order granting plaintiff's motion *in limine*. Defendants also argue that since the majority of the defense counsel's arguments were made without objection, plaintiff waived any error.

¶ 103    The trial court recognized that several of defense counsel's comments were made without objection by plaintiff, but found that the cumulative effect of the comments was so serious that they deprived plaintiff of a fair trial. The trial court noted that comments made without objection will only be reviewed when they are "so egregious that they deprived a litigant of a fair trial" and that only the most blatant indiscretions warrant such review. However, the trial court noted that in *Zoerner*, the appellate court ruled that urging the jury to make a social statement about drunk driving in closing argument was sufficiently prejudicial to warrant appellate review, despite the fact that plaintiff did not object at trial or even challenge the argument in a posttrial motion. *Zoerner*, 250 Ill. App. 3d at 584-86. The trial court further noted that, in *Owen v. Willett Truck Leasing Corp.*, 61 Ill. App. 2d 395 (1965), "reversible error [is] committed where liability is a close question of fact, and the conduct and arguments of counsel or incidents transpired in the course of the proceedings which clearly deprived a litigant of a fair trial and improperly prejudiced the jury in its verdict." *Owen*, 61 Ill. App. 2d at 402. The trial court had the opportunity to observe the jury and any visual effect the comments had on jurors.

¶ 104    Defendants argue that invited comments do not provide a basis for reversal and that each of defense counsel's challenged comments was made in response to plaintiff's counsel's arguments. Defendants claim that plaintiff's counsel invited comments regarding Officer Thedos being paid by the residents of Cook County when he made repeated references to Officer Thedos failing to properly perform her duties. Defendants also claim that defense counsel's comments regarding Officer Thedos' "indifference to the public" and "lack of any regard or due regard for civilians" opened the door for defense counsel's comments urging the jury to make a decision about "what the community wants." Defendants also argue that plaintiff's counsel's assertion that Margaret's BAC was irrelevant because it "proves nothing

more than a violation of the statute" and "ha[s] nothing to do with the facts of this case" invited defense counsel's comments that "[w]e *** make judgments about who should be on our roads and the condition they should be in" and "we have to consider what we want out there [on the roads]." Defendants also argue that defense counsel's statement that a drunk driver killed his aunt was invited by plaintiff's counsel's reference to his children burying each other up to their necks in sand.

¶ 105 We agree that invited comments may not constitute grounds for reversal. See, *e.g.*, *People v. Hudson*, 157 Ill. 2d 401, 445 (1993); *Oldenstedt v. Marshall Erdman & Associates, Inc.*, 381 Ill. App. 3d 1, 14 (2008). However, we find that defendants' argument that defense counsel's comments were invited are unpersuasive. The connection between plaintiff's counsel's arguments and defense counsel's "responses" is tenuous. Plaintiff's counsel's mention of the officer's lack of regard for the safety of civilians did not invite defense counsel to call upon the jury to make a community judgment against plaintiff. Nor did plaintiff's counsel's mention of the relevance of Margaret's BAC invite defense counsel's comment calling for the jury to render a social judgment about who should be on the roads.

¶ 106 As the trial court noted, plaintiff's counsel's image of his children burying each other in the sand was intended to illustrate the helplessness suffered by plaintiff as a result of being rendered a quadriplegic in the accident. By contrast, defense counsel's story of his aunt brought in facts not before the jury and was intended to make the case a personal vendetta. The trial court found that defense counsel's statement, however true, was not invited by plaintiff's counsel and improperly invoked defense counsel's personal loss to garner sympathy. "[I]t is highly improper for an attorney to do or say anything in argument the only effect of which will be to inflame the passions or arouse the prejudices of the jury against one of the parties without throwing any light upon the question for decision." (Internal quotation marks omitted.) *Svoboda v. Blevins*, 76 Ill. App. 2d 277, 281 (1966) (quoting *Coal Creek Drainage & Levee District v. Sanitary District of Chicago*, 336 Ill. 11, 45 (1929)).

¶ 107 Defense counsel's statement attempted to associate Margaret with the drunk driver that had killed his aunt and was allowed over plaintiff's objection. Remarks that inflame the passions or prejudices of the jury constitute reversible error, and it is "within the sound discretion of the trial court to determine whether arguments are inflammatory because it has the superior opportunity to observe the impact of the remarks on the jury." *Fintak v. Catholic Bishop of Chicago*, 51 Ill. App. 3d 191, 197 (1977).

¶ 108 The trial court was in the best position to judge the effects of defense counsel's comments, and it found that, while each of defense counsel's improper statements alone may be insufficient to merit a new trial, cumulatively they constituted grounds for a new trial. Based on the evidence we cannot say the trial court's decision to grant plaintiff's motion for new trial was arbitrary, fanciful, or unreasonable. We therefore find no abuse of discretion and affirm the trial court's grant of a new trial based on defense counsel's improper statements.

¶ 109 B. Admissibility of Dr. Lieken's Testimony

¶ 110 On appeal, defendants note that the trial court was bound by this court's decision in the

first *Petraski* appeal that the proposed expert testimony at the first trial regarding Margaret's BAC was relevant and reliable and that its probative value was not outweighed by concerns of prejudice. *Petraski*, 382 Ill. App. 3d at 28-32. Defendants argue that since this court found that the jury should hear expert testimony regarding Margaret's BAC, the admission of Dr. Lieken's testimony was proper, and the trial court's grant of a new trial based on the trial court's finding that it erred in admitting portions of Dr. Lieken's testimony was an abuse of discretion.

¶ 111    Following this court's decision in the first *Petraski* appeal, the trial court allowed Dr. Lieken to testify to his opinions as to Margaret's BAC. Dr. Lieken opined, to a degree of medical certainty, Margaret's BAC was above 0.08. Lieken testified to the effects of intoxication on the average person, but then went on to attribute those effects to Margaret's actual conduct.

¶ 112    In granting a new trial, the trial court noted that Dr. Lieken's methods for conversion of serum-blood alcohol level and retrograde analysis were reliable. The trial court also reasoned that the jury is responsible for weighing the evidence and drawing reasonable inferences and, therefore, found that conflicting evidence regarding conversion rates did not render the evidence inadmissible. However, the trial court held that it erred by allowing Lieken to opine that Margaret was in fact both intoxicated and impaired at the time of the accident.

¶ 113    In the first *Petraski* appeal, this court found:

"[T]he alcoholic consumption evidence is relevant to the issue of Petraski's contributory negligence. *** The jury could have used O'Donnell's [the defendant's toxicology expert at the first trial] testimony as an explanation for Petraski's conduct. It would have provided the jury with a reason why Petraski turned left in front of an on-coming emergency vehicle, green arrow or not." *Petraski*, 382 Ill. App. 3d at 28.

¶ 114    Defendants argue that this court also made it clear that evidence both of Margaret's BAC *and the consequential impairment to her abilities* was relevant because her BAC was above the 0.08 level that allows for a statutory presumption: "Here, there was evidence that Petraski's blood-alcohol level was more than 0.08 at the time of the accident, supporting a presumption that she was under the influence." *Petraski*, 382 Ill. App. 3d at 28; see also 625 ILCS 5/11-501.2(b)(3) (West 2000).

¶ 115    In effect, defendants claim that once an individual's BAC is above the statutory presumption that the individual is under the influence, it is also presumed that the individual is impaired. However, under section 11-501.2(b)(3) of the Illinois Vehicle Code (625 ILCS 5/11-501.2 (b)(3) (West 2000)), a BAC above 0.08 allows only the presumption that an individual was "under the influence of alcohol." Defendants cite *Wade v. City of Chicago Heights*, 216 Ill. App. 3d 418 (1991), in support of their claim, but nothing in *Wade* suggests that an expert may testify that an individual was in fact impaired or intoxicated based solely on a BAC result above the presumptive level. In fact, in *Wade*, this court noted:

"Although one who is intoxicated can be said to be under the influence of alcohol, the converse is not necessarily true: one may be under the influence of alcohol in varying degrees [citations] without necessarily being considered intoxicated. [Citations.] As previously noted, neither section 11-501 nor section 11-501.2 employs the term

'intoxicated.' Nor is the concept of being under the influence anywhere statutorily equated with being intoxicated." *Wade*, 216 Ill. App. 3d at 434.

¶ 116    Defendants argue that Illinois precedent allows expert testimony to explain BAC test results and that barring Dr. Lieken's testimony regarding the effects of Margaret's BAC on her conduct will leave the jury without guidance as to the meaning of her BAC test results. However, the trial court did not rule that it had erred in admitting the entirety of Dr. Lieken's testimony, only that part of his testimony where Lieken opined that Margaret was in fact intoxicated and impaired. Therefore defendants' argument that the trial court's ruling would leave the jury with evidence of Margaret's BAC but no explanation of that result is unpersuasive.

¶ 117    Defendants further argue that in several Illinois appellate court cases, once the statutory presumption is met, and expert testimony has been admitted where the expert opined that an individual was impaired based solely on that individual's BAC. In *Thomas v. Brandt*, 144 Ill. App. 3d 95 (1986), the defendant's expert was allowed to testify that based on a test result of a 0.114 taken at 11:55 a.m., he would think that plaintiff had was intoxicated at the time of the accident, which was estimated to have occurred at 5 a.m. *Thomas*, 144 Ill. App. 3d at 97. Defendant's expert further testified that he would think plaintiff's "ability to function" was impaired, even though he admitted that he could not give an opinion as to the degree of impairment because "individual capacities vary." *Thomas*, 144 Ill. App. 3d at 97.

¶ 118    In *Thomas*, plaintiff's blood sample, taken more than six hours after the accident, returned a result of 0.114. Defendant's expert did not testify as to what this result would mean in terms of plaintiff's BAC at the time of the accident. Nor did he testify that plaintiff was in fact intoxicated and impaired, only that based on such a result "he *would think* plaintiff had consumed alcoholic beverage[s] and was intoxicated." (Emphasis added.) *Thomas*, 144 Ill. App. 3d at 97.

¶ 119    In *Cuellar v. Hoot*, 168 Ill. App. 3d 416 (1988), the appellate court found that defendant's expert's testimony regarding plaintiff's BAC was properly admitted. In *Cuellar*, defendant's expert opined that plaintiff was intoxicated, based on a BAC of 0.104. *Cuellar*, 168 Ill. App. 3d at 420. However, the appellate court also found that plaintiff had waived the issue of the admissibility of defendant's expert's testimony as to plaintiff's intoxication. *Cuellar*, 168 Ill. App. 3d at 422. The appellate court noted that, had the issue not been waived, plaintiff's claim would not have prevailed, reasoning that defendant's expert "did take into account facts specific to plaintiff *** in coming to his opinion." *Cuellar*, 168 Ill. App. 3d at 423.

¶ 120    Furthermore, in *Cuellar*, as in *Thomas*, the issue on appeal was whether the trial court had erred in *admitting* the expert's testimony. *Cuellar*, 168 Ill. App. 3d at 420; *Thomas*, 144 Ill. App. 3d at 96. The appellate court did not rule in either case that exclusion of such testimony would have been an abuse of discretion. None of the cases defendants cite indicate that Illinois precedent necessarily *requires* the admission of expert testimony that an individual is "in fact intoxicated" based only on the fact that their BAC is above the level that would allow a statutory presumption that the individual is under the influence.

¶ 121    In *Burris v. Madison County*, 154 Ill. App. 3d 1064 (1987), defendant challenged the trial

court's exclusion of evidence of plaintiff's BAC. The appellate court found "that it was error to exclude defendant's evidence regarding plaintiff's possible intoxication as well as the results of the blood test *and the expert's interpretation of that result*." (Emphasis added.) *Burris*, 154 Ill. App. 3d at 1069. In *Burris*, the trial court excluded BAC evidence based on the appellate court's ruling in *People v. Murphy*, 124 Ill. App. 3d 695 (1984), barring such evidence if the person drawing blood was not certified. *Burris*, 154 Ill. App. 3d at 1068. During the trial, *Murphy* was reversed by the Illinois Supreme Court. *Burris*, 154 Ill. App. 3d at 1069. Based on that reversal, the appellate court found that the trial court had erred in excluding the BAC evidence. *Burris*, 154 Ill. App. 3d at 1069.

¶ 122    In reversing the trial court, the appellate court in *Burris* noted that the trial court had denied plaintiff's initial motion *in limine* to exclude evidence regarding plaintiff's possible intoxication and granted plaintiff's renewed motion based solely on the appellate court's ruling in *Murphy*. *Burris*, 154 Ill. App. 3d at 1068. The appellate court reasoned, "the trial court denied plaintiff's [initial] motion and held the defendant's intoxication evidence to be admissible. In its permissible exercise of discretion on the point, we can find no abuse." *Burris*, 154 Ill. App. 3d at 1071.

¶ 123    In the instant case, the trial court noted it is possible for an expert to reasonably opine that a specific plaintiff may have been impaired based on unusually high levels of intoxication. *Marshall v. Osborn*, 213 Ill. App. 3d 134, 140-41 (1991) (permitting expert testimony that a BAC of 0.320 would "have a profound effect on [decedent's] perception, judgment, and physical abilities"). However, *Marshall* involved an individual whose BAC was four times the legal limit of 0.08.

¶ 124    The trial court found that, given Margaret's much lower BAC level, Dr. Leiken's testimony attributing the possible effects of alcohol consumption to her actual conduct was speculative. See *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 886 (1999) ("[E]xpert opinions based upon the witness's guess, speculation, or conjecture as to what he believed might have happened are inadmissible."). In other words, there was no proper basis for Dr. Leiken's opinion. See *Petraski*, 382 Ill. App. 3d at 28 ("A party must lay a foundation sufficient to establish the reliability of the bases for the expert's opinion."). Dr. Lieken had no evidence of Margaret's conduct leading up to the accident. There was no evidence that she was speeding or otherwise driving erratically. Beyond the blood sample, there was no evidence to corroborate a finding of impairment. Lieken did not take into account any specific information about Margaret personally or the events leading up to the accident.

¶ 125    For these reasons, the trial court found that Dr. Lieken's testimony that Margaret was intoxicated and impaired was unreliable, and caused plaintiff to suffer unfair prejudice, and it had erred when it admitted this testimony. We cannot say that the trial court's grant of a new trial on these grounds was arbitrary, fanciful, or unreasonable. We therefore find no abuse of discretion.

¶ 126                    C. Admissibility of Dr. Morrison's Testimony

¶ 127    Since we have already found that the trial court did not abuse its discretion in granting

-20-

a new trial, we now analyze whether Dr. Morrison's testimony should be barred. The trial court had previously barred this testimony and now contemplates allowing it at retrial.

¶ 128     In order to prevail on his complaint, plaintiff has the burden of proving that Officer Thedos' conduct was willful and wanton. Willful and wanton conduct is defined as "a course of action which shows *** an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2010). Dr. Morrison would have opined that Officer Thedos was suffering from uncontrolled bipolar disorder, and he identified symptoms of anger, irritability, poor judgment, and impulsiveness as precipitating factors for her conduct.

¶ 129     Defendants argue that the assessment of willful and wanton conduct is based on the objective nature of the conduct, and that Officer Thedos' mental health history is not relevant. Defendants further argue that a determination of willful and wanton conduct is a question of fact for the jury and Dr. Morrison's testimony would unnecessarily invade the province of the jury. Defendants also claim that Dr. Morrison's opinions are based upon conjecture and speculation and that the potential for unfair prejudice far outweighs its probative value.

¶ 130     In finding that it had erred in excluding Dr. Morrison's testimony, the trial court agreed that testimony concerning Officer Thedos' mental state is not *necessary* for an evaluation of whether her conduct was willful and wanton. However, the trial court found that Dr. Morrison's testimony was nonetheless still relevant. The trial court noted that relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Internal quotation marks omitted.) *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57 (2000).

¶ 131     The trial court noted that, under this court's holding in the first *Petraski* appeal, alcohol evidence was relevant because it could provide a potential reason that plaintiff turned when she did at the intersection. *Petraski*, 382 Ill. App. 3d at 28. In finding that it had erred in excluding Dr. Morrision's testimony, the trial court found that, by the same reasoning, evidence of Officer Thedos' mental state was relevant to the question of whether Officer Thedos' conduct was willful and wanton, insofar as it would offer a potential reason for such conduct.

¶ 132     The trial court acknowledged that Illinois courts have assessed claims of willful and wanton misconduct by police in vehicular accident cases based only on the officers' behavior at the time, and without reference to the officers' mental states. See, *e.g.*, *Nelson v. Thomas*, 282 Ill. App. 3d 818, 830 (1996); *Breck v. Cortez*, 141 Ill. App. 3d 351, 362 (1986). However, the trial court found that evidence of Officer Thedos' mental health history could explain her behavior in support of a showing of carelessness.

¶ 133     The trial court reasoned that the Illinois Supreme Court found that psychiatric testimony was probative in providing a reason for plaintiff's conduct in *D.C. v. S.A.*, 178 Ill. 2d 551 (1997). However, that is not what *D.C.* is about. In *D.C.*, a plaintiff-pedestrian sustained injuries from an automobile accident after stepping off a curb into the path of defendant's motor vehicle. Plaintiff's treating physician referred plaintiff for psychiatric care after

plaintiff indicated that he might have been attempting suicide at the time of the accident.

¶ 134    Defendants filed a motion to compel the production of plaintiff's psychiatric and psychological records, and plaintiff objected. The trial court ordered that certain portions of plaintiff's psychological record after the accident be disclosed to defendants, and plaintiff appealed. *D.C.*, 178 Ill. 2d at 555-56. The Illinois Supreme Court, reversing an appellate court decision, found that the trial court had not abused its discretion in ordering the disclosure of plaintiff's records, noting that "the information is relevant as it pertains to plaintiff's conduct and actions at the time of the accident. The information is probative as well because it appears to provide a possible explanation of how the accident occurred." *D.C.*, 178 Ill. 2d at 569. *D.C.* did not involve psychiatric testimony and opinions.

¶ 135    *D.C.* is not a case, as we have here, where a mental health care professional testifies as a retained expert to a party's mental health based solely on records obtained prior to an automobile collision. In *D.C.*, the defendant was attempting to obtain only the records after the pedestrian was struck by an automobile where the defendant claimed that the pedestrian walked in front of his vehicle. The psychiatric records were compiled during the plaintiff's stay in a hospital and mental health facility immediately after the accident. The plaintiff's refused disclosure was based on the psychiatric-patient privilege under the Mental Health and Development Disabilities Confidentiality Act, and after an *in camera* review, the trial court allowed the disclosure of certain records referring to plaintiff's purported conduct at the time of the accident.

¶ 136    In the case at bar, it is the plaintiff who desires his retained expert to testify to defendant Officer Thedos' mental health prior to the time of the accident, without examining the defendant. Further, plaintiff does not allege in her complaint that the defendant has any mental conditions that affected her in the operation of her motor vehicle.

¶ 137    Defendants argue that Dr. Morrison's testimony is unreliable and speculative due to the fact that Dr. Morrison was not present at the accident scene and never personally examined Officer Thedos. Expert testimony cannot be based on speculation and conjecture. *Dyback v. Weber*, 114 Ill. 2d 232, 244 (1986).

¶ 138    The trial court here found that Dr. Morrison had sufficient facts available to allow her to give reliable testimony regarding Officer Thedos' mental health in the period leading up to the accident. The trial court then reasoned that if Maragaret's BAC results must be admitted as a "reason" for her actions under the first *Petraski* appeal, then it is reasonable to extend that same standard to Dr. Morrison's testimony.

¶ 139    Mental health professionals are normally not allowed to provide expert testimony to evaluate willful and wanton conduct in negligence cases. *Hudson v. City of Chicago*, 378 Ill. App. 3d 373 (2007); *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087 (1995). Instead, as the trial court acknowledged, willful and wanton conduct has consistently been assessed by considering only the parties' actions at the time. *Nelson v. Thomas*, 282 Ill. App. 3d 818 (1996); *Breck v. Cortez*, 141 Ill. App. 3d 351 (1986). The law defines willful and wanton as a "course of action" and not a state of mind. 745 ILCS 10/1-210 (West 2010). Accordingly, it follows that Officer Thedos' actions may be willful and wanton regardless of what she was thinking or what her subjective manifestations of thought process was. Thus, Officer Thedos'

-22-

conduct is best evaluated by determining her *actions* at the time as opposed to attempting to guess the reasons underlying those actions.

¶ 140    Further, the defendants argue Officer Thedos' mental health is not relevant because it was never placed at issue in the plaintiff's third amended complaint. To determine relevancy, the trial court must interpret the evidence in light of factual issues raise by the pleadings. *Edward M. Cohen & Associates, Ltd. v. First National Bank of Highland Park*, 249 Ill. App. 3d 929, 939 (1993). A plaintiff's complaint frames the case's issues. *McGoey v. Bruce*, 395 Ill. App. 3d 847, 849 (2009). Evidence is only relevant if it proves a fact in controversy or renders a matter at issue more or less probable. *In re Stephen K.*, 373 Ill. App. 3d 7, 29 (2007). Only relevant evidence is admissible. *In re Stephen K.*, 373 Ill. App. 3d at 29.

¶ 141    Since there is no mention of Officer Thedos' mental health in the third amended complaint, Officer Thedos' mental health is not at issue. See *McGoey*, 395 Ill. App. 3d at 849. The third amended complaint discusses only Officer Thedos' physical actions with no reference to her mental state. Therefore, any evidence introduced to address Officer Thedos' mental health is irrelevant and, consequently, inadmissible. See *In re Stephen K.*, 373 Ill. App. 3d at 29. Moreover, the presence of the affirmative defense of contributory negligence does not alone place the plaintiff's mental health at issue. *D.C. v. S.A.*, 178 Ill. 2d 551, 565 (1997). It would be a dangerous precedent in the trial of an automobile collision to determine the subjective manifestation of a person's thought process, especially by a retained expert. The trial court thus abused its discretion in determining that plaintiff's retained expert would aid the jury. *People v. Anderson*, 113 Ill. 2d 1, 12 (1986).

¶ 142    Defendants additionally argue that the probative value of Dr. Morrison's testimony is minimal in comparison to its ability to unfairly prejudice Officer Thedos. Relevant evidence may be barred if its probative value is minimal compared to its danger of producing unfair prejudice. *People v. Bedoya*, 325 Ill. App. 3d 926, 937 (2001). Given that Officer Thedos' mental state is unnecessary in determining willful and wanton conduct, it is likely that Dr. Morrison's testimony will have minimal probative value. See *Nelson v. Thomas*, 282 Ill. App. 3d 818 (1996). Even if Dr. Morrison's testimony is relevant, it may potentially prompt the jury into placing more weight on Officer Thedos' mental disorders than on her actions leading to the accident.

¶ 143    In the case at bar, Dr. Morrison's testimony's prejudicial effect far outweighs any possible probative value.

¶ 144    In the case at bar the trial court also noted that, in the first *Petraski* appeal, this court found that evidence that Officer Thedos failed to call in "code" before proceeding "was relevant for the jury's determination of whether Thedos was acting in a willful and wanton manner at the time of the collision." *Petraski*, 382 Ill. App. 3d at 33. The trial court reasoned that if Dr. Morrison's testimony can explain why Officer Thedos failed to call in code or otherwise act as she did, it was relevant evidence.

¶ 145    We held in the first *Petraski* appeal that the fact that Officer Thedos failed to call in "code" before proceeding was relevant, not testimony speculating why she did not call in "code."

¶ 146                         III. CONCLUSION

¶ 147    Where defense counsel's improper comments made in closing argument deprived the plaintiff of a fair trial, the trial court's grant of a new trial was not an abuse of discretion.

¶ 148    Because of their importance on remand, we also consider the issues of the admissibility of expert testimony raised in defendants' interlocutory appeal. We cannot say that the trial court abused its discretion when it found that it had erred in allowing Dr. Leiken to testify that Margaret was in fact intoxicated and impaired. We further find that the trial court did not abuse its discretion in barring the testimony of Dr. Morrison.

¶ 149    Affirmed.