# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Reed v. Ault, 2012 IL App (2d) 110744**

---

| | |
|---|---|
| Appellate Court Caption | ALLAN K. REED, Independent Administrator of the Estate of Brenda S. Reed, Deceased, Plaintiff-Appellant, v. SUSAN E. AULT, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-11-0744 |
| Filed | May 3, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a situation that started when defendant's vehicle slid off an icy road and got stuck in a ditch and plaintiff's decedent was killed when she was struck by another vehicle after she stopped and went to aid defendant, the jury's rejection of plaintiff's claim that under the "rescue doctrine," defendant proximately caused decedent's death by placing herself in a position of peril and causing decedent to attempt a rescue was affirmed, since the jury could have found that defendant was not negligent and the rescue doctrine did not apply, or that the doctrine did not apply because decedent did not knowingly place herself at risk to save defendant from imminent peril. |
| Decision Under Review | Appeal from the Circuit Court of Stephenson County, No. 07-L-039; the Hon. David L. Jeffrey, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | H. Kent Heller, of Heller, Holmes & Associates, P.C., of Mattoon, for appellant. |
|---|---|
| | Donna R. Honzel, of Mateer & Associates, of Rockford, for appellee. |
| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion. |
| | Justices McLaren and Hudson concurred in the judgment and opinion. |

## OPINION

¶ 1     In 2007, defendant, Susan E. Ault, lost control of her vehicle on an icy road and ended up in a ditch. Brenda S. Reed stopped her vehicle and, as she approached defendant, was struck and killed by *another* vehicle that lost control on the ice. Plaintiff, Allan K. Reed, as independent administrator of Brenda's estate, sued defendant for negligence. Specifically, plaintiff alleged, pursuant to the "rescue doctrine," that defendant placed herself in a position of peril and, when Brenda attempted to rescue her, proximately caused Brenda's death. On April 13, 2011, a jury rejected plaintiff's negligence claim and found in defendant's favor. Plaintiff appeals, arguing that: (1) defense counsel committed plain error in closing argument; (2) the court erred in sustaining a defense objection during plaintiff's rebuttal closing argument; (3) the court erred in refusing two of plaintiff's proposed jury instructions and allowing, instead, defendant's proposed instructions regarding the rescue doctrine and burden of proof thereon; and (4) the jury's verdict is contrary to the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                 I. BACKGROUND

¶ 3                                 A. Overview

¶ 4     The witnesses at trial were comprised of the drivers and/or passengers of five vehicles that either were involved in the accident or stopped after the accident. To provide an overall picture of the scene, we briefly note that the accident happened on Route 26 near Freeport. Defendant was driving south on Route 26 but lost control of her vehicle; it landed in the ditch adjacent to the northbound lane (vehicle 1). After seeing defendant land in the ditch, three vehicles stopped: (1) Brenda was driving north on Route 26 and, after viewing defendant go off the road, came to a stop south of defendant's car, on the shoulder of the northbound lane (vehicle 2); (2) Robert Martin, who was driving north, pulled his car into a driveway north of defendant's vehicle (vehicle 3); and (3) Brandon Kemp, who was also driving his truck north, stopped on the shoulder of the northbound lane, behind Brenda's

vehicle and, therefore, south of defendant's vehicle (vehicle 4). The vehicle that struck and killed Brenda, hereinafter the Morrison vehicle, was driving south on Route 26 when it lost control and came to rest in the ditch adjacent to the northbound lane and south of defendant's vehicle (vehicle 5).

¶ 5                                    B. Evidence at Trial

¶ 6        Defendant testified at trial that, on March 3, 2007, at around 12:45 p.m., she was driving south on Route 26 on her way to Freeport. The speed limit on Route 26 is 55 miles per hour and defendant was driving between 50 and 55 miles per hour. It was a sunny day and it was not snowing or raining; however, it was cold and windy and, as it had snowed the night before, there was snow on the ground and there were occasional patches of snow, ice, and slush on the road. Defendant testified that, despite the occasional snow patch, the roads were clear and she was not experiencing any sliding. Defendant testified that she does not use her cell phone while driving and that she was not using her cell phone, smoking, or eating when the accident occurred; rather, her phone was in her purse and her hands were on the wheel at the 9 o'clock and 3 o'clock positions because she did not know what the next area of road would be like. As defendant approached a curve in the road near Freeport, she saw another patch of snow and ice. As she had done with prior ice patches, defendant slowed her car to 40 or 45 miles per hour and kept both hands on the wheel. Defendant's car slid on the ice; she panicked and reacted by applying the brakes, losing control of the vehicle. At trial, she was asked "and you knew you shouldn't hit the brakes," and defendant replied "yes." Defendant's car made a complete revolution and slid across the road, off the shoulder, and down into the bottom of a ditch.

¶ 7        Defendant took a deep breath and tried to move the car, but the wheels spun and the car was stuck. When defendant tried to open her driver's side door, she realized she could not open it far enough to exit because it was resting against a snow drift. Defendant then exited from the passenger-side door. When asked to estimate the time it took for her to exit the car after landing in the ditch, defendant testified that it took a "couple [of] seconds, just stopped, took a breath, realized I couldn't get out of my car on that side, opened the passenger side, got out." As defendant exited her car, planning to use her cell phone to call a tow truck, she saw Brenda and her son, Benjamin, who had been traveling north on Route 26 before stopping, walking toward her on the shoulder.[1] Defendant assumed they had stopped to see if she was all right. Defendant was not injured and she walked at a normal pace up to the shoulder and toward Brenda and Ben. Defendant intended to tell Brenda that she was fine and thank her for stopping, but Brenda was approximately one block away and defendant did not holler.

¶ 8        Before defendant had an opportunity to speak with Brenda, she heard Ellen Morrison's vehicle approaching and, when she looked at it, she could tell it was going to lose control on the ice patch. Defendant turned to run back toward her car, trying to get to a safe spot;

---

[1]The snow had been pushed off the road and down into the ditch, leaving a strip of gravel on the shoulder.

Brenda and Ben ran in different directions. She heard the impact of Morrison's vehicle striking Brenda. When Morrison's vehicle came to a stop, it landed in the ditch about one block away from defendant's vehicle. After calling 911, defendant noticed for the first time that another car had stopped and was sitting in a nearby driveway. A man was standing outside the vehicle, and a woman was sitting inside. Defendant approached the car and told the woman that she was okay and that she had called 911. Defendant told the woman and the 911 operator that Brenda had stopped to help defendant.

¶ 9    Prior to the accident involving Morrison's vehicle, defendant had not tried to flag anyone down or direct traffic and did not notice anyone else doing so; she believed her car was located in a spot far enough off the road that it would not cause a problem. Defendant did not think she was in any danger and did not think "in a million years" that someone else would slide off the road the same way, same time, that day. A tow truck pulled defendant's car to the road, but there was no damage to it and she drove it home. After the accident, defendant saw a plow come to clear the curve where she and Morrison had slid. Further, she heard a State Trooper talk about the fact that the roadway was "banked" a little bit as it curved to the left.

¶ 10    Ben Reed testified that he was age 15 at the time of these events and that Brenda was driving him to a band competition. They were driving north on Route 26 and saw defendant's car spin out of control in front of them and end up in the ditch. It appeared to Ben that, as the car slipped off the road, the car's driver was turning the wheel to try to control the car. Because Brenda was a nurse, Ben asked her to stop to check on the person who had spun into the ditch. Brenda stopped the car and went to talk to other drivers who had pulled over, including three men and a woman. As Ben and Brenda approached the vehicle in the ditch, Ben noticed "a lady climbing out of the window" of the driver's side of the car. The car was pretty far off the road and, although it appeared stuck, it was not on fire and there was no smoke or steam coming from it. Ben saw the driver get out of the car and walk toward him, but then his attention was drawn to the Morrison vehicle, which was coming pretty fast. He ran toward the car in the ditch to get out of the way. The Morrison vehicle slid past him, hit the Reed car, and hit Brenda.

¶ 11    Robert Martin testified that, on March 3, 2007, he and his wife, Tina, were driving north on Route 26. It was a sunny day, but windy, approximately 40 degrees, and some snow had drifted the night before. The roads were "fairly clear," with snow drifting across on occasion. Areas with slush build-up were "few and far between." Martin was driving between 50 and 55 miles per hour. As he approached a curve in the road, Martin noticed snow blowing across it and a "lot of slush on it." He slowed down because he had driven the road numerous times and knew that "that curve is a menace when it comes to snow blowing" and that it is a particularly slick curve because of the way it banks from left to right. Martin saw defendant's vehicle approach the curve; he testified that he saw her hit the brakes and start to slide, rotating around and landing in the ditch approximately 15 feet away from the road. As defendant's vehicle crossed his lane of traffic and in front of him, Martin "believe[d]" that

defendant had a cell phone in one hand and a cigarette in the other.[2] After defendant's vehicle stopped, Martin could see that it was not damaged, smoking, or steaming, and it simply looked stuck.

¶ 12    Martin drove north and parked in a driveway; for her safety, he told Tina to stay in the car and he exited, intending to see if defendant was okay. He observed that defendant was moving around in her vehicle; she did not appear injured, so, when he went to check on her, it was to make sure she had someone coming who could pull her out of the ditch, to give her a ride, or to let her sit in his car to keep warm while waiting for help. Martin saw that another car (the Reed vehicle) and a truck (with three people who stayed inside the truck) had also pulled over onto the shoulder. Martin began walking at a normal pace because he did not feel any need to hurry. Similarly, he saw Brenda and Ben exit their vehicle and walk, at a normal pace, toward defendant's car; defendant was still in her vehicle. Martin felt that defendant's car was far enough off of the road that it was well out of harm's way, and he was not concerned about himself or anyone else being in danger. A couple of minutes later, he heard traffic noise, saw Morrison's Jeep approaching the slushy area, and was concerned because the young driver was driving 50 to 55 miles per hour and was on her cell phone. Until this point, Martin had not thought that another car might have trouble at the same spot of slush and did not think it was likely to happen twice in the same spot. As the Jeep started to slide, Martin yelled at Brenda and Ben, and Ben looked up and jumped out of the way. The Jeep turned and hit Brenda, landing about 30 feet from defendant's car. In his deposition, Martin testified that, when the Jeep began sliding toward Brenda, he believed defendant was standing outside of her car and was talking on her cell phone.

¶ 13    After Brenda was hit, Martin asked his wife to go farther north to try to slow down cars that might be coming. He was concerned about the curve and that drivers might not expect the curve to be as slippery as it was, and he thought drivers would have a hard time seeing if there were something on the road, or they might not appreciate how slick or deep the ice and slush were. Martin later mentioned to a police officer that a plow should clear the curve, and, at some point, that occurred.

¶ 14    Martin was deposed on July 6, 2010. At that time, Martin referred to notes he had prepared that were dated the day of the accident. He testified that he had not shared those notes with anyone.[3]

¶ 15    Brandon Kemp testified that he was driving his pickup truck north on Route 26 with two passengers, Michael Dierksen and Mikaeyla Rickman, when he saw defendant go into the ditch. According to Kemp, defendant's car was approximately 30 to 40 feet off of the roadway. Kemp pulled over his truck onto the shoulder, behind Brenda's vehicle, and he got

---

[2]In plaintiff's appellate brief, he states that "on cross-examination, opposing counsel suggested to Mr. Martin that the first time he had mentioned that [defendant] was on a cell phone or smoking a cigarette was at the time of his deposition." Plaintiff provides no record citation for this proposition, and we did not, in our review of the record, find any such suggestion during Martin's cross-examination.

[3]This information appears in the record as an attachment to plaintiff's posttrial motion.

out of the truck to see if defendant needed him to call anyone or to tow her car out of the ditch. Prior to this incident, road conditions had not caused Kemp to slow his vehicle below 55 miles per hour. Defendant's car looked stuck, not damaged, and he could see defendant moving around in her car and then quickly exit her vehicle. Kemp was not concerned that defendant was at all injured, based upon the manner in which defendant moved and because she quickly exited her car. Indeed, although Kemp and his passengers had cell phones, no one discussed calling 911; defendant's car just appeared stuck. Kemp and Brenda exchanged pleasantries, they walked in a normal pace toward defendant, and there was no conversation of calling for emergency services or concern that defendant was in danger. As Kemp walked toward defendant, he saw Morrison's Jeep coming; he was surprised because it was not something that had occurred to him as likely to happen, and he had not been concerned that cars might slide into him and strike him while he walked on the shoulder. There was no time to yell before the Jeep hit Brenda. Dierksen testified consistently with Kemp.

¶ 16    Ellen Morrison testified that she was driving under the speed limit, 50 to 55 miles per hour, when she came to the curve. Prior to her sliding on the curve, she had not encountered any slipping or sliding on the road that day, the roads were otherwise "fine," and she did not notice the snow, slush, or ice on the curve. Morrison testified that she was not on her cell phone when she slid. When Morrison started to spin, she was concerned that she would hit Brenda's vehicle parked on the shoulder, not the car in the ditch. Morrison testified that she received a ticket from the police officer who responded at the scene. Her car was damaged from hitting Brenda and hitting Brenda's car, and it was towed from the scene.

¶ 17    State Trooper Erin Lanthrip testified that she responded to the scene. Lanthrip testified that she was the last state car to arrive and, upon her arrival, she: (1) spoke with her coworkers, who had obtained some witness information; and (2) "just took account of the scene basically." Lanthrip testified that her duties include preparing reports and diagrams at crash scenes and that she used the information she had obtained from her coworkers, as well as the information she gathered, to prepare an accident report. Using her report to refresh her recollection, Lanthrip recalled that the curve on Route 26 is graded or banked on a slope and that, the day of the accident, the curve had snow and slush on it. She ticketed Morrison as having caused the crash, and she prepared for her report a diagram of the locations of the persons and vehicles involved in the accident. On that diagram, Unit 1 was used to depict Morrison's vehicle as the vehicle that caused the crash. Unit 2 represented where Brenda's body was located on the ground. Unit 3 represented Brenda's car. Lanthrip testified that defendant's vehicle was depicted on the diagram only as an outline of another car with the words "not related" next to it because it was involved in an incident separate from the accident. In the narrative section of her report, Lanthrip noted that defendant's vehicle lost control and landed in the ditch and that Brenda stopped to check on defendant; however, Lanthrip testified that defendant's loss of control was separate and apart from the crash, and, so, she did not make note of the license plate number or vehicle identification number on defendant's car. Lanthrip testified that defendant's vehicle was out of harm's way and, further, that it just appeared stuck, but not damaged. Lanthrip's report lists Martin as a witness, but attributes no statements to him. Defense counsel asked Lanthrip whether she wrote the ticket that Morrison testified she received. Plaintiff objected, and the court

-6-

sustained the objection. Defense counsel asked Lanthrip, "you did not write a ticket for [defendant?]" Plaintiff objected, and the court sustained the objection.

¶ 18    On cross-examination, Lanthrip agreed that successive collisions are a concern where roads are icy. If there is sufficient manpower, controlling traffic so that no one else goes off the road at the same point helps to ensure that no one is injured. Lanthrip testified that other officers performed traffic control, both to preserve the scene and to prevent other accidents. She agreed that, at a crash scene, one puts himself or herself at risk by exiting a vehicle.

¶ 19                              C. Closing Arguments

¶ 20    In plaintiff's closing argument, counsel commented that Martin had testified that, when defendant lost control of her car, she was on a cell phone and smoking a cigarette. He noted that Martin "had no pony in this race" and no reason to testify falsely. "If she wasn't talking on the cell phone and that were an issue, there would be a bill to show you that there wasn't any cell usage at that time; and you don't have that."

¶ 21    In response, defense counsel noted in her closing argument that, regarding the cell phone and cigarette testimony, "the first time Mr. Robert Martin was ever asked about the details was three to three-and-a-half years after this incident ***. *** Mr. Martin, trying to be helpful, but three-and-a-half years later, sometimes with time you add facts. You fill in facts, kind of going back and trying to think how things are." Further, counsel noted that, if there were a cell phone bill reflecting that defendant *was* on her cell phone at the time of the accident, plaintiff certainly would have produced that. Plaintiff's counsel did not object to this testimony.

¶ 22    In his rebuttal closing argument, plaintiff's counsel stated that Lanthrip testified that "she took statements from all the people that were at the scene the day of the incident. And if Mr. Martin had said something different at the time he was at the scene than he did when his deposition was taken, you can be sure that [defense counsel] would have mentioned that." Defense counsel objected:

> "DEFENSE COUNSEL: Objection, that's not in evidence and no such statement.
>
> THE COURT: Sustained. The jury will disregard that.
>
> PLAINTIFF'S COUNSEL: But you heard the officer say she took the statements from every one of these people.
>
> DEFENSE COUNSEL: Objection, facts not in evidence.
>
> PLAINTIFF'S COUNSEL: That is what she testified to, Judge.
>
> THE COURT: Quite frankly, I don't remember whether she testified to that or not. It will be the jury's collective memory as to whether she testified to that."

¶ 23                              D. Jury Instructions

¶ 24    The court instructed the jury regarding negligence, explaining that negligence means the failure to do something that a reasonably careful person would do, or the doing of something that a reasonably careful person would not do under similar circumstances. Further, the court

instructed that ordinary care means the care a reasonably careful person would use under the circumstances and that defendant had a duty to use ordinary care to avoid placing herself in danger.

¶ 25    Before instructing the jury, the court had rejected plaintiff's proposed jury instruction Nos. 18 and 19 in favor of defendant's instruction Nos. 6 and 16. Instruction Nos. 18 and 19, *refused* by the court, stated as follows:

"No. 18: The Rescue Doctrine arises when a Plaintiff brings a negligence action against a Defendant whose negligence has placed a party in a position of peril even if it is the defendant himself. If the Plaintiff is injured in the attempted rescue, he is allowed to negate a presumption that: (1) his intentional act of rescue is the superceding cause of his injuries, thereby allowing him to prove that the Defendant's negligence is the proximate cause of his injuries; and (2) that he is guilty of contributory negligence by the mere act of voluntarily assuming that known risk of harm unless he acts rationally [*sic*] or recklessly. Essentially, the Doctrine provides that it is always foreseeable that someone may attempt to rescue a person who has been placed in a dangerous position and that the rescuer may incur injuries in so doing. Therefore, if the Defendant was negligent in placing a person in danger, he is also negligent towards the rescuer.

No. 19: That Plaintiff claims that the Defendant's next-of-kin are entitled to compensation as the result of the negligent acts of the Defendant. In order to prevail, the Plaintiff is required to prove the following:

1) that the Defendant committed a negligent act;

2) that the negligent act placed the Defendant or some other person in a position of perceived danger;

3) that the Plaintiff's Decedent was attempting to provide aid or 'rescue' the person in the place of danger;

4) that as a result of the attempt to provide aid or rescue the Defendant, the Plaintiff's Decedent was killed.

If you find from your consideration of the evidence that the Plaintiff has proven each of the propositions required to be proven, then your verdict should be for the Plaintiff and you should assess damages as provided in these instructions. If you find, however, that the Plaintiff has not proven any one of these propositions, then your verdict should be for the Defendant."

¶ 26    Defendant's instruction Nos. 6 and 16, *accepted* by the court and provided to the jury, explained as follows:

"No. 6: The Rescue Doctrine arises when a plaintiff brings a negligence action against a defendant whose negligence has placed the defendant in a position of *imminent peril or danger*. If the plaintiff in an attempt to save the life or secure the safety of the defendant voluntarily assumes a known risk of harm and is injured in that attempted rescue, she is allowed to negate a presumption that her intentional act of rescue is the cause of her injuries. This allows her to prove that the defendant's negligence is the proximate cause of her injuries and not her actions in attempting a rescue in the face of

a known risk of harm. The plaintiff is also allowed to negate a presumption that her act of assuming a known risk was contributory negligence, unless she acted rashly or recklessly.

No. 16: The plaintiff claims that the decedent's next-of-kin are entitled to compensation as the result of the negligent acts of the defendant. In order to prevail, the plaintiff is required to prove the following:

1. That the defendant committed a negligent act;

2. That the defendant's negligent act placed the defendant herself in a position of *imminent peril or danger*;

3. That the plaintiff's decedent voluntarily assumed a known risk of harm in an attempt to save the life or secure the safety of the defendant in that position of *imminent peril or danger*; and

4. That as a proximate cause of the attempt to rescue the defendant, the plaintiff's decedent was killed.

If you find from your consideration of the evidence that the plaintiff has proven each of the propositions required to be proven, then your verdict should be for the plaintiff and you should assess damages as provided in these instructions. If you find, however, that the plaintiff has not proven any one of these propositions, then your verdict should be for the defendant." (Emphases added.)

¶ 27 The court briefly explained that it found defendant's instructions to be clear, less confusing to the jury than plaintiff's proposed instructions, more consistent with the case as it was presented to the jury, and more accurate in reflecting the rescue doctrine as defined in case law.

¶ 28                                   E. Jury Verdict and Posttrial Motion

¶ 29 The jury returned a verdict in defendant's favor. The court denied plaintiff's posttrial motion, wherein plaintiff attached a note, purportedly handwritten by Martin and labeled "Martin Ex. 1," that was dated March 3, 2007. In the note, Martin recounted the accident events and stated that, when he saw defendant fishtail, slide, and turn 180 degrees, she was talking on a cell phone and a cigarette was in her hand. Plaintiff appeals.

¶ 30                                            II. ANALYSIS
¶ 31                                            A. Plain Error
¶ 32 Plaintiff argues first that defense counsel's comments in closing argument were improper. Specifically, plaintiff notes that defense counsel suggested to the jury that Martin's testimony regarding defendant smoking a cigarette and using her cell phone during the accident arose for the first time 3½ years after the accident. This was improper, plaintiff argues, because Martin did not testify that he was questioned for the first time 3½ years after the accident, and, indeed, "[Lanthrip] testified that she interviewed all of the witnesses at the scene." Further, plaintiff notes, defense counsel had in her possession Martin's handwritten statement, drafted the day of the accident, which mentioned that defendant had a cell phone

and cigarette. Therefore, plaintiff concludes, counsel's suggestion that Martin fabricated this information was known by counsel to be untrue and was unsupported by the evidence. Plaintiff notes that counsel argued at trial that defendant did nothing an ordinary person would not have done; thus, whether defendant was smoking and talking on the phone while driving through snow and slush might have been important to the jury's deliberation on this issue. Thus, plaintiff concludes, counsel's suggestion that Martin invented facts was so improper as to deprive plaintiff of a fair trial.

¶ 33    Defendant notes that plaintiff did not object at trial to defendant's statements and, therefore, that this issue is forfeited. See *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 14 (failure to contemporaneously object to alleged error in closing argument forfeits issue for review). Although plaintiff does not specifically request this court to review the issue for plain error under Illinois Supreme Court Rule 615(a) (Ill. S. Ct. R. 615(a)), she states, in her issue statement, that counsel committed plain error and she asserts generally that counsel's comments deprived her of a fair trial. We note that application of the plain-error doctrine (which may permit a reviewing court to review claims of error not properly preserved at trial) in *civil* cases is "exceedingly rare." (Internal quotation marks omitted.) *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 8 (2007). Plain error applies in civil cases only where there was an egregious error so prejudicial that it deprived the complaining party of a fair trial. *Id.*; see also *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 514 (1994) (in a civil case, a court may review forfeited error when necessary to a "just result" and to maintain a "sound and uniform body of precedent"); *Simmons v. University of Chicago Hospitals*, 162 Ill. 2d 1, 12-13 (1994) (in a civil case, a court may review forfeited error where the litigant did not receive a fair trial or the judicial process suffered "deterioration"). Nevertheless, the applicability of the plain-error doctrine (or any other exception to forfeiture) is immaterial here because there was no error.

¶ 34    The prejudicial impact of comments made in closing argument is left to the sound discretion of the trial court. *Petraski v. Thedos*, 2011 IL App (1st) 103218, ¶ 97. Attorneys are permitted wide latitude in closing argument. *Id.* Here, the court did not abuse its discretion in failing to *sua sponte* order a new trial. First, defense counsel did not accuse Martin of fabricating his testimony. Rather, counsel's arguments that Martin was not asked the "details" of the event until his 2010 deposition and that, therefore, details might have been "filled-in" over time, pertained to the credibility of Martin's comments regarding the cigarette and cell phone. Second, counsel's comments were not contrary to the evidence. Lanthrip did *not* testify that she (as opposed to her coworkers) interviewed all of the witnesses at the scene, that the witnesses provided any statements, or that the witnesses were asked to provide any detailed information regarding defendant going off the road–as opposed to Morrison's vehicle hitting Brenda, which, as Lanthrip testified, was the only accident she was investigating. Nor did Martin testify at trial that, at any time prior to his deposition, he discussed with police or anyone else the details about defendant sliding into the ditch and, specifically, his recollection that defendant was holding both a cigarette and a cell phone. Further, at his deposition, Martin agreed that the handwritten notes that he prepared the day of the accident had *not* previously been shared with *anyone*. Martin was not asked about these notes at trial. Thus, there is no dispute that Martin's handwritten notes were not

provided to police, nor were they mentioned before or presented to the jury.

¶ 35    It is the jury's function to weigh the credibility of evidence. *Snover v. McGraw*, 172 Ill. 2d 438, 448 (1996). Defense counsel was permitted to argue to the jury why it should not place great weight on portions of Martin's testimony. There is nothing in the record reflecting that Martin was ever asked about the details of defendant's accident prior to his deposition, which was undisputedly more than three years after the accident. His handwritten notes, which were not presented at trial, are not relevant to this court's consideration of whether counsel's comments were so unfair as to require a new trial. Thus, plaintiff's claim fails.

¶ 36                    B. Defense Objection During Plaintiff's Closing Argument

¶ 37    Plaintiff next argues that the court erred in sustaining defendant's objection during her rebuttal closing argument. Specifically, plaintiff argued to the jury that, if Martin had given a statement to police inconsistent with his deposition or trial testimony, defendant would have presented that inconsistent statement at trial. Defendant's objection was sustained. Plaintiff argues that the court erred because he could not, in closing, rebut defendant's claim of recent fabrication with a prior consistent statement and, therefore, counsel's mere argument to the jury that Martin consistently told the truth was proper.

¶ 38    Again, plaintiff refers to a prior police statement that does not exist. Plaintiff repeatedly references that Lanthrip testified that she interviewed everyone at the scene. However, Lanthrip testified that she spoke only with her coworkers who had obtained some witness information. Although Martin is listed on the crash report as a witness, there is absolutely no statement in the record explaining whether he was questioned about defendant going off the road and, if he was, whether he said anything about her being on a cell phone and holding a cigarette. Again, Martin did not even testify that he spoke with police about defendant's accident, let alone what he told them. Therefore, where plaintiff's counsel in closing argument repeatedly stated that Lanthrip testified that she took statements at the scene, which was contrary to the evidence, the court properly sustained defendant's objection.

¶ 39                                    C. Jury Instructions

¶ 40    Next, plaintiff argues that the trial court erred in rejecting his proposed jury instructions. Specifically, he argues that defendant's instructions, which the court allowed, were misleading because they stated that defendant must be in a position of *imminent* peril and that the position of peril must be life-threatening. Plaintiff argues that the law requires neither imminent peril nor life-threatening danger for the rescue doctrine to apply.

¶ 41    The determination whether to give a jury instruction lies in the trial court's discretion, and we will not reverse that determination unless no reasonable person would adopt the court's position. *Eskew v. Burlington Northern & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶ 31. "The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). Further, we will not reverse a trial court for giving faulty instructions unless the instructions clearly misled the jury and resulted in prejudice to the

appellant. *Id.* at 274.

¶ 42    The rescue doctrine arises when a plaintiff brings a negligence action against a defendant whose negligence has placed a third party *or himself or herself* in a position of peril. *Tannehill v. Costello*, 401 Ill. App. 3d 39, 42 (2010); *Strickland v. Kotecki*, 392 Ill. App. 3d 1099, 1104 (2009) (considering as a matter of first impression whether the doctrine could apply where the defendant placed himself or herself (not a third party) in a position of peril and answering that question in the affirmative). "A rescuer is someone who voluntarily attempts to save the life or secure the safety of another who is in a position of peril. [Citation.] Often, when a rescuer comes to the aid of another, the rescuer knowingly subjects himself to *imminent* peril." (Emphasis added.) *Seibutis v. Smith*, 83 Ill. App. 3d 1010, 1015-16 (1980). The doctrine applies to protect the rescuer, whose contributory negligence would otherwise preclude recovery for the damages he or she sustained in the rescue effort. See *Devine v. Pfaelzer*, 277 Ill. 255, 259 (1917) (recognizing that the purpose of the rescue doctrine is to permit recovery where contributory negligence would ordinarily defeat the action). Accordingly, because of the risk and because public policy interests promote rescue, the doctrine permits the plaintiff (*i.e.*, rescuer) who is injured in the attempted rescue to negate the presumptions: (1) that his or her intentional act is the superseding cause of his or her injuries, thereby establishing the defendant's (*i.e.*, rescuee's) negligence as the proximate cause; and (2) that, unless he or she acts rashly or recklessly, he or she is guilty of contributory negligence by voluntarily assuming a known risk of harm. *Seibutis*, 83 Ill. App. 3d at 1016; see also *Strickland*, 392 Ill. App. 3d at 1102.[4] The doctrine essentially provides that "it is always foreseeable that someone may attempt to rescue a person who has been placed in a dangerous position and that the rescuer may incur injuries in doing so. Therefore, if the defendant is negligent towards the rescuee [which, per *Strickland*, may include himself], he is also negligent toward the rescuer." *Williams v. Foster*, 281 Ill. App. 3d 203, 207 (1996). Thus, "a defendant cannot be liable under the rescue doctrine unless his conduct is negligent." *McGinty v. Nissen*, 127 Ill. App. 3d 618, 620 (1984).

¶ 43    While plaintiff is correct that courts often describe the rescue doctrine as applying in a situation involving "peril" or "danger," with no explicit requirement that the peril or danger be "imminent," it is, nevertheless, clear that the doctrine is typically applied when the peril or danger is, in fact, imminent. See *Strickland*, 392 Ill. App. 3d at 1100 (the plaintiff was injured when he jumped a fence to rescue the defendant, who was attempting suicide by running a hose from his exhaust pipe to the passenger window of his car); *Williams*, 281 Ill. App. 3d at 204 (the plaintiff was injured while rescuing the trapped defendants from the

---

[4]Indeed, as the doctrine promotes rescue by protecting the rescuer from claims that his or her contributory negligence, as opposed to the rescuee's negligent actions, proximately caused the rescuer's injury, it is not clear that the doctrine would even apply to situations like the one here, where there was an intervening act of negligence (*i.e.*, by Morrison's vehicle) that caused the injury. The distinction between a condition (defendant's vehicle) that led to an injury, and a *cause* (Morrison's vehicle) of the injury, might suggest that the intervening negligence might negate application of the doctrine altogether. Nevertheless, we need not address these subtleties here, because the verdict is affirmable on multiple other bases.

second floor of their burning house); *Seibutis*, 83 Ill. App. 3d at 1012 (the plaintiff was injured when she approached a vehicle that was stopped in the center lane of a highway where cars were driving 60 miles per hour). Indeed, and as mentioned above, the doctrine has been described as existing *because* a rescuer might knowingly subject herself to "imminent peril." *Seibutis*, 83 Ill. App. 3d at 1016; see also *West Chicago Street R.R. Co. v. Liderman*, 187 Ill. 463, 469 (1900) (considering facts where a child was almost hit by a street car and noting "the general rule is that a person has a right to risk his own life or limb in an effort to *save the life* of another person, and cannot be charged with contributory negligence in so doing" (emphasis added)); *Ingram v. Jackson*, 206 Ill. App. 466 (1917) (noting, in a case where a son tried to rescue a father from an oncoming train and both were killed, that an attempt to rescue one from imminent danger may not amount to contributory negligence).

¶ 44    Further, the rescue doctrine has been rejected in cases where, although danger arguably existed to some degree, it was not imminent or of a type such that an injury to the plaintiff was so foreseeable that placing on the defendant the burden to guard against such injury would be practicable. For example, in *Tannehill*, the court found the rescue doctrine inapplicable where the defendant, an elderly woman who was recuperating from recent open heart surgery, was experiencing pain and, refusing an ambulance, frantically asked the plaintiff to drive her to the hospital. The plaintiff injured her shoulder helping the defendant into her car. *Tannehill*, 401 Ill. App. 3d at 44. There, the court found that the defendant did not place herself in a situation where she would know others might attempt to rescue her and that the plaintiff's injury was not foreseeable such that burdening the defendant with guarding against such an injury was practicable. *Id.*

¶ 45    In *McGinty*, the plaintiff, while babysitting for the defendants' children, was injured when she attempted to rescue the defendants' two-year-old child as he ran toward an open and steep stairway in the defendants' home. The court noted: "The existence of a legal duty depends not only upon the reasonable foreseeability of injury, but also upon the likelihood of injury from the existence of the particular conditions, the magnitude of the burden of guarding against the injury, the consequences of placing the burden upon the defendant, public policy[,] and social requirements." *McGinty*, 127 Ill. App. 3d at 620-21. Thus, the court rejected the plaintiff's argument that, by failing to protect the stairway with a gate or other protective device, the defendants created a reasonably foreseeable risk of harm to *her*, holding that, although it may be reasonably foreseeable that a young child might fall, and be injured, on a steep stairway, "[t]o require parents to install gates at the tops of the stairways in their residences at the risk of *liability to those who would attempt to prevent children from falling* down the stairs would be to hold parents to a duty of extraordinary care." *Id.* at 621. Accordingly, together, *Tannehill* and *McGinty* suggest that, even where a danger arguably exists, it must be of a nature that creates a foreseeable risk to those who might attempt to assist; most likely, such a danger will be imminent.

¶ 46    Therefore, as to the issue of whether the court erred in instructing the jury that the rescue doctrine applies to situations of imminent peril or danger, we conclude, given the foregoing case law, that the court did not abuse its discretion and that defendant's jury instructions, taken as a whole and given the facts of this case, were appropriate and fairly apprised the jury of the relevant legal principles.

-13-

¶ 47    Further, even if the court had erred in giving the instructions, we would not reverse. Critically, plaintiff has presented no evidence that: (1) the jury was misled; or (2) plaintiff was prejudiced. As more fully discussed below, the jury here could have found that, regardless of the severity of peril, defendant was *not negligent*, thus negating application of the rescue doctrine altogether. Therefore, plaintiff's claim of prejudice based on the instructions is merely speculative. See *Snelson v. Kamm*, 204 Ill. 2d 1, 32 (2003) (no reversal where allegations of prejudice–that the jury "may" have decided case on improper basis–were only speculative).

¶ 48    Finally, we note that plaintiff also argues that the court erred in instructing the jury that, for the rescue doctrine to apply, defendant must have been in a life-threatening position. We quickly reject this argument because plaintiff ignores that the instructions *also* permitted application of the doctrine where the rescuer acted "to secure the defendant's safety." Therefore, the jury was not limited to considering only whether the situation was life-threatening. Accordingly, there was no error, and, even if there was error, plaintiff suffered no prejudice.

¶ 49                              D. Jury Verdict

¶ 50    Plaintiff's final argument is that the jury's verdict in defendant's favor is contrary to the manifest weight of the evidence. He argues that he proved: (1) that defendant acted negligently where she was traveling too fast for conditions, did not keep her vehicle under control, stepped on the brake instead of accelerating or steering out of the skid, and landed in a ditch; (2) that Brenda and others attempted to aid defendant, whom they perceived to be in a position of danger; and (3) damages. We disagree.

¶ 51    It is well established that, in reviewing a jury verdict, we may not reweigh the evidence and substitute our opinion for that of the jury. *Id.* at 35. Instead, we may reverse a jury verdict only where the verdict is contrary to the manifest weight of the evidence, *i.e.*, where the opposite conclusion is clearly evident. *Id.* Here, we cannot find the opposite conclusion clearly evident.

¶ 52    First, and as noted above, defendant cannot be liable under the rescue doctrine unless her conduct was negligent. *McGinty*, 127 Ill. App. 3d at 620. The evidence showed that, the day of the accident, the roads were clear except for occasional patches of slush. Defendant was driving under the speed limit at 50 to 55 miles per hour, she slowed down when she saw patches of snow or ice, and she did not slip or slide until the accident. Defendant's testimony was corroborated by Martin, Kemp, and Morrison, who similarly testified that, although there were patches of slush and ice, they did not slip or slide and they, too, drove at a speed of around 50 to 55 miles per hour. Defendant testified that, as she approached the curve, she noticed a patch of snow and ice and slowed her vehicle to 40 or 45 miles per hour. Similarly, Martin testified that he was aware that the curve was "a menace" and could be slippery, so he, too, slowed his vehicle as he approached it. When defendant's car hit the curve, however, she started to slide. Defendant panicked and hit the brakes to stop herself. Although this action caused her car to rotate and slide into the ditch, the jury could reasonably have found that, under the circumstances, a reasonably careful person might have responded in a similar

-14-

fashion. It was also for the jury to weigh the evidence to decide whether it believed defendant, when she said she was not talking on a cell phone or smoking a cigarette, or Martin, who testified that he "believed" that she was, or whether, even if it did credit Martin's testimony, those actions fell below the exercise of care by a reasonably careful person.

¶ 53 In sum, the jury could have reasonably found that, under the circumstances, defendant exercised the ordinary care that a reasonably careful person would use to avoid placing herself in a place of danger. As such, and given the undisputed testimony that Morrison's vehicle struck and ultimately killed Brenda, the jury could have found that defendant was not the proximate cause of Brenda's death or that it was not reasonably foreseeable to *defendant* that her actions would put Brenda in a position of risk. Accordingly, even if the jury believed that Brenda was a rescuer who knowingly placed herself at risk in an effort to save defendant's life or secure her safety, the verdict must be affirmed because the jury could have found defendant not negligent and, therefore, that the rescue doctrine did not apply.[5]

¶ 54 The converse may also be true. In other words, it is possible that the jury found that, even if defendant acted with negligence, the rescue doctrine was inapplicable because the evidence did not reflect that Brenda knowingly placed herself at risk to save defendant's life or secure her safety from a position of imminent peril. Plaintiff argues that the evidence reflects that it is because Brenda stopped to rescue defendant from her position of peril that she was killed. While we agree with plaintiff that the evidence reflected an intention by those who stopped, including Brenda, to offer aid to defendant, we disagree that the only conclusion to be drawn from the evidence is that they viewed defendant to be in a position of danger, let alone imminent danger. Indeed, the witnesses all testified that defendant's vehicle was far off the road and appeared to be out of harm's way, that defendant was moving around and appeared uninjured, that defendant's vehicle was not damaged, but simply appeared stuck in the snow, that no one anticipated another car would slip and injure them, and that no one called 911 or walked at anything other than a normal pace to see if defendant needed help. Defendant is correct that the rescue doctrine does not specifically require the rescuer to run; nevertheless, "[w]hether one is a rescuer depends both on the state of mind of the person asserting he was acting as a rescuer and on the facts and circumstances of the individual case that bear out his alleged role of being a rescuer." *Seibutis*, 83 Ill. App. 3d at 1017. Thus, although Brenda and other witnesses stopped to verify that defendant was all right, the jury could have reasonably found, based on the facts and circumstances of the incident, that Brenda did not act in a manner reflecting that she was voluntarily assuming a known risk of harm *to herself* in order to save defendant's life or secure defendant's safety. If it found Brenda did not voluntarily assume a known risk, the rescue doctrine and its purpose of absolving the rescuer of the legal effects of assumption of risk or contributory negligence would not be implicated.

---

[5]There were no special interrogatories offered in this case, so we do not know whether the jury found in defendant's favor because it found her not negligent, because it found the requirements of the rescue doctrine otherwise inapplicable, or both.

¶ 55      In sum, the jury's verdict is not contrary to the manifest weight of the evidence, as we cannot conclude that the opposite conclusion is clearly evident. The jury's verdict is affirmed.

¶ 56                             III. CONCLUSION

¶ 57      For the foregoing reasons, the judgment of the circuit court of Stephenson County is affirmed.

¶ 58      Affirmed.